NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CITY YELLOW CAB COMPANY and G. I. Cab Company, Respondents.

No. 15923.

United States Court of Appeals
Sixth Circuit.

April 20, 1965.

Paul M. Thompson, N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Elliott Moore, Attorney, N. L. R. B., Washington, D. C., on brief, for petitioner.

William R. McClenathen, Akron, Ohio, Buckingham, Doolittle & Burroughs, Edward C. Kaminski, Akron, Ohio, on brief, for respondents.

Before MILLER, PHILLIPS and EDWARDS, Circuit Judges.

PHILLIPS, Circuit Judge.

The National Labor Relations Board has filed a petition for enforcement of its order, which is reported at 144 N.L.R.B. 994. The labor organization involved is Taxicab Drivers Union Local No. 345, affiliated with the Teamsters. Respondents, who operate taxicabs in Akron, Ohio, contend that enforcement of the Board's order should be denied, raising four questions:

(1) Whether the Board properly treated the two respondents as a single employer; (2) whether the Board has jurisdiction over respondents; (3) whether the Board was correct in holding that switchboard operators employed by respondents are not supervisors; and (4) whether the Board was correct in holding that the discharge of two non-union taxicab drivers was a violation of § 8(a) (3) and (1) of the Act, 29 U.S.C. § 158(a) (3) and (1).

### 1) Relationship between the two companies.

Respondents are two Ohio corporations, one known as City Yellow Cab Company and the other as G. I. Cab Company. First we consider the action of the Board in treating respondents as a single employer for jurisdictional purposes.

The record demonstrates that the two corporations have substantially the same management, and that the same four stockholders who own all the stock of City Yellow Cab also own ninety-four per cent of the stock of G. I. Cab.[1]

The Board further found additional joint operations by the two companies as follows: The offices of both respondents have been in the same building since July 1962; the taxicabs of both companies are garaged and maintained at the same location; gasoline used by the cabs of both companies come from the same pumps and parts for cabs are taken from a common source, regardless of which cabs are being repaired; switchboard operators for both companies sit at one continuous switchboard panel in the same room, taking telephone calls for cab service and relaying the requests by radio to cabdrivers; Bryon W. Fry, an officer and director of both companies, makes major personnel decisions, such as the disciplining, hiring and discharging of employees, and makes purchases for

1. The following stipulation appears in the record:

"The following describe the management of Respondents G. I. Cab Company and City Yellow Cab Company, during the period January 1, 1962, to and including the present.

|  | G. I. Cab | City Yellow Cab |
|---|---|---|
| Bd. of Dr. | Wm. R. McClenathen | Wm. R. McClenathen |
|  | Bryon W. Fry | Bryon W. Fry |
|  | C. P. Chima | C. P. Chima |
|  | Jack H. Gibson | (There is no fourth member of the Board of Directors) |
| President | Wm. R. McClenathen | Bryon W. Fry |
| Vice Pres. | Bryon W. Fry | Wm. R. McClenathen |
| Secretary | Jack H. Gibson | Wm. R. McClenathen |
| Treasurer | C. P. Chima | C. P. Chima |
| Top Mgr. of Operations | Bryon W. Fry (Genl. Mgr.) George E. Edick, (Asst. Mgr.) | Bryon W. Fry (Genl. Mgr.) Jack H. Gibson (Asst. Mgr.) |
| Corp. Atty. | Wm. R. McClenathen | Wm. R. McClenathen |
| Stockholders | Wm. A. Walsh (15 shares) | (No stock owned) |
|  | C. P. Chima (31 shares) | (59 shares) |
|  | Jack H. Gibson (45 shares) | ( 9 shares) |
|  | Bryon W. Fry (80 shares) | (91 shares) |
|  | Wm. R. McClenathen (80 shares) | (91 shares) |

Total shares outstanding at G. I. Cab from January 1, 1961 to present is 251 shares. Total shares outstanding at City Yellow Cab from January 1, 1961 to present is 250 shares."

both companies; the same person is the immediate supervisor of the switchboard operators for both companies; and the same person supervises the mechanics for both.

Respondents contend that the two companies in fact compete with each other; that all records and financial transactions are kept separate; that their labor policies are different (primarily in that employees of G. I. Cab are not unionized and employees of City Yellow Cab are represented by a union); that the cabs are dispatched somewhat differently; that there is some variance in fringe benefits; and that the companies have separate bank accounts, social security, internal revenue, and unemployment compensation accounts, and separate Ohio workmen's compensation accounts.

We conclude that under the foregoing findings of the Board, which are supported by substantial evidence, the Board was justified in treating the two corporations as a single employer for jurisdictional purposes. N. L. R. B. v. Stowe Spinning Co., 336 U.S. 226, 69 S.Ct. 541, 93 L.Ed. 638; N. L. R. B. v. Elias Bros. Big Boy, Inc., 325 F.2d 360, 362 (CA 6); Cf. N. L. R. B. v. Winn-Dixie Stores, Inc., 341 F.2d 750 (C.A. 6).

### 2) Jurisdiction

The trial examiner made the following findings of fact relative to the gross receipts and interstate commerce links of respondents:

"The gross volume of business of Respondent G. I. Cab and Respondent Yellow Cab was $293,835.45 and $780,160.05, respectively, during 1961, and $281,521.75 and $765,986.-10, respectively, during 1962. In 1962, Respondent G. I. Cab received automobiles valued in excess of $24,-000, and Respondent Yellow Cab received automobiles valued in excess of $43,000, directly from points outside the State of Ohio. Approximately 5 percent of the trips of both Respondents involve conveyance of passengers between links and channels of interstate commerce such as depots, terminals, airports, and hotels." 144 N.L.R.B. at 995.

Although part of the testimony concerning the purchase of automobiles is confusing, we hold that the findings of the Board are supported by substantial evidence on the record as a whole, and that under these facts the Board was authorized to exercise jurisdiction. N. L. R. B. v. Reliance Fuel Oil Corp., 371 U.S. 224, 83 S.Ct. 312, 9 L.Ed.2d 279; N. L. R. B. v. Denver Building Council, 341 U.S. 675, 684, 71 S.Ct. 943, 95 L.Ed. 1284; McLean v. N. L. R. B., 333 F.2d 84 (C.A. 6); N. L. R. B. v. Crystal Laundry & Dry Cleaning Co., 308 F.2d 626 (C.A. 6); N. L. R. B. v. City Transportation Co., 303 F.2d 299 (C.A. 5), cert. denied, 371 U.S. 920, 83 S.Ct. 288, 9 L.Ed. 2d 230.

### 3) Whether switchboard operators are supervisors

Respondents do not dispute that their conduct toward the switchboard operators violated Section 8(a) (1) and (3) of the Act, 29 U.S.C. § 158(a) (1) and (3), if they were employees as defined in Section 2(3), 29 U.S.C. § 152(3). The only issue as to the unfair labor practices with respect to the switchboard operators is whether or not the Board was correct in finding that they were "employees" rather than "supervisors." It is contended by respondents that the Board was in error in holding that switchboard operators were "employees" and not "supervisors" as defined by Section 2(11) of the Act, 29 U.S.C. § 152 (11). If the operators are supervisors, Section 14(a) of the Act, 29 U.S.C. § 164(a), relieves the respondents of the duty to bargain with a union as their representative.

The facts concerning the switchboard operators in the present case are set forth in detail in the decision of the Board at 144 N.L.R.B. 994, and will not be repeated here except in summary.

During the summer of 1962, all of the switchboard operators except two signed and mailed to Bryon W. Fry, President of City Yellow Cab and Vice President of G. I. Cab, a petition demanding an improvement in their pay and working conditions. On the next pay day Mr. Fry called two of the switchboard operators to his office, told them that he did not like the word "demand" in their petition, and that "their demands were silly, asinine and ridiculous." Thereafter one switchboard operator was demoted to driver and then fired, and another was discharged upon grounds of "economy." A representative of management stated that "the rest of the people that signed the petition will rue the day they put their names on that paper." Thereupon the switchboard operators asked the assistance of the union, and eight of the ten operators signed union cards. The union demanded recognition and respondents refused on the basis that the switchboard operators were supervisors. Mr. Fry told one of the operators that "they couldn't tolerate a unionized switchboard." It is uncontradicted that the majority of the switchboard operators signed cards authorizing the union to represent them.

On October 28, two switchboard operators and a few drivers began picketing respondents' premises, carrying signs: "ON STRIKE FOR UNION RECOGNITION." The strike ended after respondents obtained two temporary restraining orders from Ohio courts. Ultimately four switchboard operators and two drivers for G. I. Cab were discharged. The Board ordered all six employees reinstated, with back pay plus interest.

The primary function and duty of the switchboard operators was to receive telephone calls from customers for taxicab service and to relay these requests to available cabdrivers. Other duties as summarized by the Board are set forth in the margin.[2]

2. "Another duty is answering inquiries or complaints from customers concerning delayed or poor service, and attempting to ascertain the cause of the delay or quality of service by communicating with the cabdriver. In such cases the switchboard operator attempts to satisfy the customer, but refers any 'major' complaint either to Edick or to Fry. Switchboard operators also 'check-in' cabdrivers by accepting their record of trips and cash collected. This function also is performed at times by cabdrivers and garage mechanics.

"Cabdrivers are preassigned their cabs on a 'trip board.' In situations not covered by the preassignment recorded on trip board, the switchboard operator occasionally furnishes a cab to a driver based on established policies with respect to the seniority of the driver and also depending on which driver first made known his availability to drive. Although a switchboard operator may try to resolve grievances of the cabdrivers, the matter is referred to Edick if he fails in the attempt.

"Switchboard operators report to the office infractions of the Respondents' rules by the cabdrivers. These are verbal reports which do not contain any recommendations for discipline. Also, upon occasion, cabdrivers have been called in 'off the road' by switchboard operators for violation of company rules. In such cases the drivers are not permitted to resume their driving duties until permitted to do so by Edick or Fry. Although a switchboard operator may ask a driver to work past his scheduled quitting hour, the driver is free to refuse the request without incurring any disciplinary action.

"Drivers report accidents to the switchboard operators. If requested by the driver, the switchboard operator sends an ambulance or telephones the police. Further, under established procedure the switchboard operator reminds the driver of certain information to be secured, such as the names of witnesses.

"On out-of-town trips the trip rate which is quoted to a driver by a switchboard operator is ascertained by reference to a 'flat rate' book provided by the Respondents. The only direction given to a driver in such a case would be a reminder to pick up a spare tire as required by company rules. Although switchboard operators may authorize cabdrivers to accept a charge or a customer's check, the authority is limited by whether or not the Respondents previously have passed on the credit rating of the customer involved.

"The record does not show that the authority of the switchboard operators was increased during the night hours and Sundays when Fry, Edick and Gibson were not present in the office. In

This court recently considered the statutory definition of "supervisor" in our decision in Eastern Greyhound Lines v. N. L. R. B., 337 F.2d 84 (C.A. 6), in which we held that dispatchers for the bus company were supervisors. There we applied the definition of the term "supervisor" as set forth in 29 U.S.C. § 152 (11).[3] We followed the well-established rule that this statute is to be read disjunctively and that if a bus company dispatcher possessed any one of the powers described in the act, to be exercised as a matter of independent judgment on the part of the dispatcher, rather than as a matter of a mere routine or of a clerical nature, he was a supervisor within the meaning of the Act. We found that bus company dispatchers under the facts of that case had the power to suspend bus drivers and effectively to recommend discipline. We pointed out that:

> "The evidence showed that in some places Eastern's terminals and its buses are in operation all day and all night. Dispatchers operate in three shifts so that one of them is in service at all hours. In the late night and the early morning hours there are generally no personnel with authority higher than that of a dispatcher on duty. If dispatchers are

not supervisors, this multistate transportation system operates a substantial part of the time without supervision." 337 F.2d at 87.

We recognized the rule that the statute does not require that the powers described therein be exercised during any definite part of the supervisor's time, and that it is the existence of the power that determines the classification.

■ Although the switchboard operators involved in the instant case are sometimes called "dispatchers," we find that substantial evidence on the record considered as a whole supports the Board's conclusion that they did not possess the authority to suspend and effectively to recommend discipline of drivers, using independent judgment, as did the bus company dispatchers in Eastern Greyhound Lines v. N. L. R. B., supra.

It is clear that the switchboard operators did not recommend disciplinary action. If a company rule was violated by a cabdriver, the switchboard operator made a verbal report to management, which did not contain any recommendation for discipline. To the contrary, in Eastern Greyhound Lines v. N. L. R. B.,

---

this connection, Justice testified, 'we generally have a given set of rules that we effectively follow, whether anybody was there or not * * * if it was severe, * * * we have even called Mr. Edick out of bed, we have called Mr. Fry out of bed.'

"The evidence shows conclusively that at all times material herein, switchboard operators had the authority to call cabdrivers in off the road. As pointed out in the Respondents' brief, this action by a switchboard operator amounted to suspension of a driver from work until such time as he was reinstated:by either Fry or Edick. However, the cabdriver involved brings his cab into the garage and reports, not to the switchboard operator, but to Edick or Fry. The switchboard operator reports orally to the office concerning the alleged violation of the driver but makes no recommendation. The matter apparently is investigated independently by Edick or Fry, who decides

whether to send the driver back to work or discipline him. The evidence does not show that they even consult with the switchboard operators in such cases; and it appears that management has never instructed the switchboard operators that they have any responsibility for disciplinary action. Further the switchboard operators work in an isolated area and have little or no contact with drivers except by radio."

3. "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

supra, a company rule applicable to dispatchers provided that the dispatcher:

"Maintains discipline and order among drivers; removes drivers from service for infraction of company policies rules and regulations; recommends disciplinary action to be taken for such infractions." 337 F.2d at 88.

Greyhound dispatchers were furnished with forms for reporting infractions of driver rules, with a space for recommending discipline. Dispatchers regularly made recommendations concerning discipline which the proof in that case showed to be effective.

Further, in Eastern Greyhound Lines v. N. L. R. B. the dispatchers had the authority to suspend a bus driver by ordering him off a bus for misconduct, intoxication or insubordination, thereby removing the driver from service and suspending him pending final determination of appropriate discipline by higher officials.

In the present case the disciplinary authority of the switchboard operators was limited to calling a cabdriver "in off the road" for failure to notify the switchboard each time he dropped off a passenger, each time he picked up a passenger, and before entering the downtown area. Upon being "called in," the driver did not report to the switchboard operator but went directly to Mr. Edick or Mr. Fry. The switchboard operator did nothing more than to make an oral report, without recommendation. Mr. Edick or Mr. Fry then would make an independent investigation and decide whether to send the driver back to work or to discipline him, without consultation with the switchboard operator. It appears that this decision would be made promptly and there was no substantial period of suspension unless imposed by Mr. Edick or Mr. Fry. This authority of switchboard operators to call in drivers off the road is not shown to constitute the power to suspend as was found to be the case in Eastern Greyhound Lines v. N. L. R. B., supra.

■■ It is contended that the switchboard operators "direct" cabdrivers, by telling the driver by radio to pick up a passenger at a given location. This "direction" consisted of nothing more than the relaying by radio of a message received by telephone. The responsibility of making assignments in a routine fashion does not transform an employee into a supervisor. Precision Fabricators, Inc. v. N. L. R. B., 204 F.2d 567 (C.A. 2).

The switchboard operators had no authority to schedule the hours of drivers or their cabs. This was done on a "trip board" on a seniority basis. Switchboard operators did not participate in preparation of the "trip board."

■ It is noted that the Board held switchboard operators or dispatchers for a taxicab company to be employees and not supervisors, under facts similar to those presented here, in Yellow Cab, Inc., 131 N.L.R.B. 239. We are cited to no decision to the contrary. We hold that under the record in the present case, whatever powers the switchboard operators had to "direct" cabdrivers or to call them in off the job were of a merely routine nature, not requiring the use of independent judgment, and did not come within the powers set forth in the statutory definition of supervisor. (See note 3.)

It is significant that the switchboard operators did not consider themselves to be supervisors nor were they so considered by the drivers. New drivers were instructed that their supervisors were Mr. Edick and Mr. Fry. Switchboard operators were never informed by management that they had any authority to discipline drivers. They were never told that they were supervisors until after the beginning of the labor dispute involved in this case.

The fact that at night and at other times no representatives of management were present at respondents' offices, as was also true in Eastern Greyhound Lines v. N. L. R. B., supra, does not necessarily mean that the switchboard operators were supervisors and a part of management. The record shows that all the officers of respondents lived in the city

of Akron and could be reached by telephone, and that if a serious situation arose at night, they were called out of bed.

We hold that there is substantial evidence on the record supporting the decision of the board that the switchboard operators did not responsibly direct cabdrivers, did not have the authority to discipline them or effectively to recommend discipline and did not exercise any other authority set forth in § 2(11) of the Act, 29 U.S.C. § 152(11) in other than a routine or clerical nature, not requiring the use of independent judgment. This case therefore is distinguishable on its facts from Eastern Greyhound Lines v. N. L. R. B., supra.

### 4) Section 8(a) (3) Violations as to cabdrivers

Two cabdrivers for G. I. Cab were discharged because they joined the switchboard operators in picketing. Respondents contend that these drivers were discharged for engaging in an unprotected activity, the employees of G. I. Cab not being represented by a union.

The Board rejected this contention, finding that the drivers for G. I. Cab were also being organized and the picket signs simply demanded recognition, this being true even if it be assumed that the operators were supervisors. We find no evidence on the record to support this holding of the Board, but nevertheless we conclude that the Board reached the correct result in ordering the reinstatement of the two cabdrivers.

■■■ The cabdrivers testified that they went on strike and engaged in picketing because they were in sympathy with the demand of the switchboard operators for recognition. The Act protects the rights of employees "to engage in * * concerted activities for the purpose of * * * mutual aid or protection." 29 U.S.C. § 157. N. L. R. B. v. Halsey W. Taylor Company, 342 F.2d 406 (C.A. 6, March 3, 1965).

As said by Judge Learned Hand in N. L. R. B. v. Peter Cailler Kohler Swiss Chocolates Co., 130 F.2d 503, 505 (C.A. 2):

> "Certainly nothing elsewhere in the act limits the scope of the language to 'activities' designed to benefit other 'employees'; and its rationale forbids such a limitation. When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a 'concerted activity' for 'mutual aid or protection,' although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each one of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is 'mutual aid' in the most literal sense, as nobody doubts."

See also N. L. R. B. v. Greensboro Coca Cola Bottling Co., 180 F.2d 840 (C.A. 4); N. L. R. B. v. Schwartz, 146 F.2d 773 (C.A. 5).

■■■ In N. L. R. B. v. Guernsey-Muskingum Electric Co-op, Inc., 285 F.2d 8, 12 (C.A. 6), this court quoted with approval the following language from N. L. R. B. v. Phoenix Mutual Life Insurance Co., 167 F.2d 983, 6 A.L.R.2d 408 (C.A. 7), cert. denied, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395:

> "A proper construction is that the employees shall have the right to engage in concerted activities for their mutual aid or protection even though no union activity be involved, or collective bargaining be contemplated. * * * [and] a legitimate interest in acting concertedly in making known their views to management without being discharged for that interest."

See also Salt River Valley Water Users' Association v. N. L. R. B., 206 F.2d 325 (C.A. 9); Annotation, 19 A.L.R.2d 566.

Enforcement granted.