506 F.2d 616
 87 L.R.R.M. (BNA) 3139, 75 Lab.Cas. P 10,510
 NATIONAL LABOR RELATIONS BOARD, Petitioner, and Teamsters
Local 25, affiliated with International
Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of
America, Intervenor,
v.
METROPOLITAN PETROLEUM COMPANY OF MASSACHUSETTS, DIVISION OF
PITTSTON CO., Respondent.
 No. 74-1181.
 United States Court of Appeals, First Circuit.
 Argued Oct. 8, 1974.
Decided Dec. 11, 1974.
 
 Richard A. Cohen, Atty., Washington, D.C., with whom Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Robert G. Sewell, Washington, D.C., were on brief, for petitioner.
 James T. Grady, Boston, Mass., with whom Grady & Kaplan, Boston, Mass., was on brief for intervenor.
 Alan S. Miller, Boston, Mass., with whom Stoneman, Chandler & Miller, Boston, Mass., was on brief, for respondent.
 Before ALDRICH, McENTEE and CAMPBELL, Circuit Judges.
 McENTEE, Circuit Judge.
 
 
 1
 The National Labor Relations Board seeks enforcement of its order[1] to bargain collectively issued against Metropolitan Petroleum Company of Massachusetts, Division of Pittston Co. (hereinafter 'the company'). The Board had certified the intervenor union as the exclusive bargaining representative of the company's dispatchers and clerks employed at its terminal in Chelsea, Massachusetts. The sole issue before us is whether substantial evidence on the record as a whole supports the Board's finding that the dispatchers are employees and not 'supervisors' within the meaning of 2(3) and 2(11) of the National Labor Relations Act, 29 U.S.C. 152(3), 152(11) (1970).[2] Since we hold the Board's finding was not supported by substantial evidence, we decline to enforce the order.
 
 
 2
 The company is engaged in the storage, sale and delivery of heavy and light fuel oil and related products, and serves the Boston metropolitan area from its facility in Chelsea. The company's management personnel include James Cavanaugh, who has overall responsibility for the operation; Paul Kelly, who is responsible for the terminal; John Hill, who is responsible for maintaining a proper fleet; and Walter Anderson, the delivery and dispatch superintendent. Under Anderson are five dispatchers, two of whom direct the distribution of light fuel oil and two of whom distribute heavy fuel oil. The fifth dispatcher is responsible for the night shift and distributes both light and heavy oil. In addition to the dispatchers, the company employs 25 to 30 permanent drivers and 60 to 70 seasonal drivers during the busy winter season.
 
 
 3
 The two distribution systems function somewhat differently. In the distribution of heavy oil the dispatcher receives orders either directly from the customer or through the company's customer order section in Neponset-- generally at least 24 hours prior to the delivery. The dispatcher then prepares the next day's delivery schedule by assigning men and equipment (either a tractor-trailer unit or smaller 'street' vehicle) to various jobs. Typically the dispatcher commits 70 per cent of his equipment and personnel by this process, while the remaining 30 per cent is held in abeyance to meet contingencies as they develop. Using his knowledge of the experience of the different drivers, the dispatcher decides each day which employees will comprise the 70 per cent and which employees the 30 per cent. If the company's drivers and trucks are all out working and it appears to the dispatcher that the day's deliveries cannot be completed, he must decide, keeping in mind the relative costs and the welfare of the drivers, whether to order company drivers to work overtime or whether to use outside trucks and drivers pursuant to lease arrangements confirmed by Anderson at the beginning of the winter season. The dispatcher can also decide to postpone delivery for a day or more. On the other hand, if more drivers are working than are needed, the dispatcher has authority to assign a driver either to the delivery of light oil or to the plant foreman for work around the plant.
 
 
 4
 In the distribution of light oil, used almost exclusively in private homes, the company utilizes a 'degree date planning system' which informs the dispatcher how many customers are due for deliveries and who those customers are. These customers are then divided into geographic 'zones,' which are established by Anderson in conjunction with the dispatchers approximately once a year, and these zones are combined to form the 'route' of a particular driver. The combination of zones in a route varies in accordance with the judgment of the dispatcher, and the dispatcher frequently exercises his authority to transfer drivers from route to route or from zone to zone. In establishing the routes, the dispatcher must allocate equipment and drivers to accomplish the deliveries without over-committing company resources or unduly restricting the flexibility to meet contingencies. Thus, for example, the dispatcher must exercise his judgment to rearrange delivery schedules if a home customer with little or no fuel telephones to request an immediate delivery. As with the heavy oil dispatchers, the light oil dispatchers can and do assign overtime. Drivers delivering light oil must telephone the dispatcher in the late afternoon and report their progress. The dispatcher then must decide whether to defer remaining deliveries until the next day or order overtime work.
 
 
 5
 As winter approaches, the number of men needed to make deliveries increases. The dispatcher makes a determination each week of how many additional men he needs for the following week, and by referring to a seniority list Anderson makes arrangements for the required number of men to be recalled to work. The converse of this process operates in the spring. Since the drivers' contract with the company requires one week's notice to lay off seasonal drivers, the dispatcher has to predict the decline in company needs at least a week ahead of time. The dispatcher's goal is to avoid keeping too many drivers on the payroll, thus raising labor costs, and simultaneously to avoid having too few drivers, thus necessitating overtime labor if delivery requirements are misjudged.
 
 
 6
 It is well settled that '2(11) is to be read in the disjunctive, with the existence of any one of the statutory powers, regardless of the frequency of its exercise, being sufficient to confer supervisory status upon the employee.' Pacific Intermountain Express Co. v. NLRB, 412 F.2d 1, 3 (10th Cir. 1969); accord, NLRB v. Magnesium Casting Co., 427 F.2d 114, 117 (1st Cir. 1970), aff'd on other grounds, 401 U.S. 137, 91 S.Ct, 599, 27 L.Ed.2d 735 (1971). The dispatchers' duties as set out above clearly satisfy the first prong of the statutory test for 'supervisors' in that the dispatchers possess the power to 'transfer, . . . lay off, recall, . . . (or) assign . . . other employees, or responsibly to direct them . . ..' 29 U.S.C. 152(11) (1970). However, an individual who possesses one of the statutory powers is a supervisor only if his 'exercise of such authority is not of a merely routine or clerical nature but requires the use of independent judgment.' 29 U.S.C. 152(11) (1970). See Poultry Enterprises, Inc. v. NLRB, 216 F.2d 798, 802 (5th Cir. 1954). Relying on this prong of the definition of 'supervisor,' the acting regional director found the dispatchers' work to be 'a routinely administered responsibility governed by functional experience and established practice.' We acknowledge that a reviewing court to a large measure will defer to the informed discretion of the Board on the question of supervisory status. See NLRB v. Swift & Co., 292 F.2d 561, 563 (1st Cir. 1961), cited with approval in Marine Eng'rs Beneficial Ass'n v. Interlake Steamship Co., 370 U.S. 173, 179 n. 6, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962), and in NLRB v. Magnesium Casting Co., supra, 427 F.2d at 117. However, the only evidence in the record as to the dispatchers' duties and powers is the unrebutted testimony of the company's operations manager, James M. Cavanaugh. After reviewing the record, we conclude that the Board's finding lacked substantial evidence, 'when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'[3] Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Cavanaugh's testimony indicates that the dispatchers' functions, far from being routine, included the maneuvering of drivers and departing from routine operations when necessary. Other courts have considered such judgmental direction of men in the field to require reversal of a Board's finding that dispatchers were not supervisors, even when other evidence seemed to indicate that the jobs involved no supervisory role. See, e.g., Arizona Pub. Serv. Co. v. NLRB, 453 F.2d 228 (9th Cir. 1971).
 
 
 7
 The Board's position is that the dispatchers' functions 'amount to no more than the clerical transmission of information, such as would be performed by a switchboard operator.' Particular reliance is placed on NLRB v. City Yellow Cab Co., 344 F.2d 575 (6th Cir. 1965). In that case the court upheld a Board determination that switchboard operators for a taxi company constituted employees rather than supervisors. This case differs from City Yellow Cab in a number of respects, however. In City Yellow Cab the primary function of the switchboard operators was to receive telephone calls from customers for taxi service and to relay these requests to available cabdrivers. 344 F.2d at 579. Here the dispatchers must do considerably more than relay phone messages. They must plan the day's deliveries in the most economical fashion, bearing in mind the customer requirements, the driver requirements, the available delivery equipment, the time required for delivery, and the experience of the driver. The general company guideline is that the customer must get his oil on time, but within that guideline the dispatcher exercised a large measure of independent discretion.[4]
 
 
 8
 In City Yellow Cab the authority of the switchboard operators was circumscribed by a given set of rules on Sundays and during the night hours, and a superior would be called out of bed if a situation was not covered by these rules. In contrast, there is no evidence that these dispatchers were required to consult with their supervisor in extraordinary situations. The dispatchers deal with breakdowns or oil spills as they feel necessary. They either order overtime or hire extra trucks if they conclude postponement of deliveries is unwise. While it is true that they can only order overtime to men according to seniority and they can only hire extra trucks from among three to five prearranged companies, they nevertheless exercise the power to decide whether further work is needed and, in the case of heavy oil, which form it should take. These differences distinguish this case from City Yellow Cab. Both in the possession of statutory power to assign drivers and in the exercise of independent judgment this case seems more analogous to Pacific Intermountain Express Co. v. NLRB, supra, where the court denied enforcement of the NLRB order, holding that the three line dispatchers at the Denver terminal of a nationwide trucking concern were supervisors. We reach a similar result here, and decline to enforce the Board order.[5] In reaching this decision we comment briefly on the Board's brief where it states that 'at least two of the Company's four managers are present on Saturdays and Sundays' during the busy season's 7-day work week. In point of fact, the record shows that during the busy season managers are present only during the day on Saturdays, whereas dispatchers are pressent throughout the forty-eight hours.
 
 
 9
 The petitioner of the Board for enforcement of its order is denied.
 
 
 
 [1]
 The order is reported at 209 N.L.R.B. No. 120 (March 25, 1974)
 
 
 [2]
 Section 2(11) defines 'supervisor' as:
 '. . . any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.' 29 U.S.C. 152(11) (1970).
 
 
 [3]
 The average hourly wage of a dispatcher was about fifty cents less than that of a driver. Counsel for the Board argues from this that it is clear that the dispatchers do not outrank and responsibly direct the drivers. We find this argument unpersuasive. Any driver who wanted time off for personal reasons had to get his dispatcher's permission, and time off was granted only without pay. In contrast, as circumstances permitted, a dispatcher could take time off if he needed it without a loss in pay. Moreover, dispatchers receive better vacation benefits than drivers. In addition, Cavanaugh stated that if the salary of Anderson, stipulated to be a supervisor, was broken down on an hourly basis, it would be less than a driver's wage rate. This illustrates the basic flaw in the Board's argument. Drivers may receive more than dispatchers simply because the multi-industry demand for their services places them in a better bargaining position. We conclude that the net differential in pay and benefits, if any, is not such that we must reject the other strong evidence that dispatchers possess supervisory powers
 
 
 [4]
 The following testimony by Cavanaugh shows that the company's delivery system is not as rigid and routine as the Board concluded:
 'Now he (the dispatcher) can either deliver early, he can deliver on time or he can deliver late. And how effectively he does this determines whether a customer gets a smaller delivery than what is ideal or whether he runs out. He must make that determination whether he can allow a customer to go, say two, three or four days beyond his delivery date and still have sufficient amount of oil left in his tank in order so that he doesn't run out.'
 
 
 [5]
 We need not consider the company's claim that the dispatchers have the power to suspend or effectively to recommend such action. Nor need we decide whether status as a supervisor only on the weekend would support a Board finding that the dispatchers are employees. Cf. Westinghouse Electric Corp. v. NLRB, 424 F.2d 1151, 1157-1158 (7th Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970)