**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HARMON INDUSTRIES, INC., Respondent.**

**No. 77–1095.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1977.

Decided Nov. 22, 1977.

Dorothy L. Moore, Washington, D. C., argued, and Jay E. Shanklin, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on brief, for petitioner, N. L. R. B.

Gordon E. Jackson (argued), W. Kerby Bowling, and Michael R. Forman, Memphis, Tenn., on brief, for respondent, Harmon Industries.

Before LAY and ROSS, Circuit Judges, and LARSON, Senior United States District Judge.*

ROSS, Circuit Judge.

In this case the National Labor Relations Board seeks enforcement of its order against Harmon Industries, Inc. pursuant to § 10(e) of the National Labor Relations Act. The sole contested issue is whether substantial evidence on the record as a whole supports the conclusion of the Board and the Administrative Law Judge that a Harmon Industries employee, Dale E. Cox, was *not* a supervisor as defined by § 2(11) of the Act.[1] Although the question is a close one, we sustain the findings of the Board and grant enforcement of the order.

Harmon Industries, Inc., located in Grain Valley, Missouri, manufactures and repairs

---

* The Honorable Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. Cox was admittedly discharged by Harmon Industries for his union activities. Discharge of an employee for the exercise of protected rights is a violation of § 8(a)(3) and (1) of the Act. The employer, Harmon Industries, has asserted that Cox is not an employee, but has supervisory status and is unprotected by the Act.

railroad signal equipment and other equipment and parts. Cox began work at Harmon Industries in December 1971, in the carrier department, where newly manufactured equipment is tested and repaired. Cox repaired equipment in the carrier department, and after two years work was made a senior technician and given a raise.

In the early part of 1975 Cox was transferred to the repair department, which is where repairs are made on malfunctioning equipment returned by customers who have purchased the equipment. Cox was discharged from his job in the repair department on September 18, 1975; it is his employment status while he worked in the repair department which is in issue.

■ Section 2(11) of the Act provides the following statutory definition of a "supervisor":

(11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

Section 2(11) is to be read disjunctively; if an individual exercises, or possesses the authority to exercise, *any one* of the enumerated functions listed in the statute, he has supervisory status. Section 2(11) does not require the *exercise* of supervisory power. " 'It is the *existence* of the power which determines the classification.' " *James H. Matthews & Co. v. NLRB*, 354 F.2d 432, 434 (8th Cir.), *cert. denied*, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966) (emphasis added).

■ However, the possession or exercise of the authority must involve the use of independent judgment. *NLRB v. Sayers Printing Co.*, 453 F.2d 810, 814 (8th Cir. 1971). Supervisory authority is not authority exercised in a merely routine manner. *Amalgamated Clothing Workers of Ameri-*

ca v. NLRB, 137 U.S.App.D.C. 93, 97, 420 F.2d 1296, 1300 (1969). Moreover, the independent judgment called for must be exercised with respect to one of the enumerated functions under the statute, and not with respect to some other aspect of the individual's work. *NLRB v. Brown & Sharpe Mfg. Co.*, 169 F.2d 331, 334 (1st Cir. 1948). Moreover, merely *infrequent* exercise of supervisory authority does not diminish the supervisory status of a supervisor. *Mississippi Valley Barge Line Co.*, 58 LRRM 1495, 1496 (NLRB 1965).

Respondent Harmon Industries alleges that Cox possessed or exercised supervisory authority under the statutory terms in the following particulars: making work assignments and transferring employees, including determining that overtime work was necessary and initialing timecards for pay adjustments; receiving the title of "leadman" on August 11, 1975, and being told he was "in charge" of the repair department; receiving a salary and a raise rather than an hourly wage; making changes in the physical layout of the repair department and revising the logging system and repair department forms; disciplining one employee and effectively recommending that he not be rehired; participating in interviews of applicants and recommending that the company hire one of the interviewed applicants; effectively recommending vacation time for one repair department employee and time off for jury duty for another; effectively recommending that one repair department technician be salaried. The respondent also relies on the statement of Cox to the Harmon company president, made at the time of his discharge, that as of late Cox considered himself part of management.

The opinion of the Administrative Law Judge dealt with each of these contentions and the supporting proof. With respect to the proffered evidence that Cox responsibly assigned work within his department, the law judge concluded that Cox had not exercised independent judgment.

The evidence shows that equipment was repaired chronologically and not in any par-

ticular order determined by Cox. The numerical order of tagging and repairing equipment was not followed when a customer came in with broken equipment, in which case the repairmen tried to finish the repair while the customer waited. On these occasions Cox took workers off other jobs, and would assist the worker, or request assistance himself for unfamiliar pieces, in an attempt to get the equipment out faster.

The company had a policy of trying to complete repairs on an item in five days; priority was given equipment which remained unrepaired after five days. Cox would ask his superiors for their approval for overtime work when the department was behind in this 5-day schedule.

Each person who worked on a particular module initially determined whether or not it was modifiable or repairable. Some repair department employees were not capable of doing repairs, but did "modifications";[2] the evidence supports the law judge's inference that those who did do repairs, the technicians, including Cox, sometimes skipped the numerically oldest jobs and moved on to other repair work "if [the technician] felt that he could not do them or that others could do them better." At one point, in response to a question, Cox agreed that it really depended on who was busy and who wasn't as to what work he assigned to individuals in the department.

The evidence is sufficient to sustain the conclusion that the assignment of tasks and flow of work in the repair department operated without the exercise of independent judgment on the part of Cox. Similarly, independent judgment was not exercised by Cox in the "transfer" of repair department employees for work in other departments. If there was nothing for a worker in the repair department to do, Cox would approach a leadperson in another department, "[w]hichever one was handy or that I saw at the time," and ask them if they could use one of the repair department workers. Cox also testified that he asked members of management when there was not enough work to do, and was told to check with other members of management about available work.

Sufficient evidence supports the conclusion that Cox did not *effectively* recommend that other employees be hired, fired or disciplined. Though Cox recommended that a replacement be hired in the repair department when Sullivan left, and participated in interviews of applicants, higher management decided that *no one* would be hired. After the interviews, Cox gave his opinion on the best applicant to Tom Davis, Cox's supervisor, but as the law judge observed, "supervisor Davis did not testify about the weight (if any) he gave to Cox's recommendation about whom to hire, and there is no evidence about the weight (if any) Davis' superiors gave to Davis' recommendation, let alone Cox's, about whom to hire."

Similarly, Cox stated to Tom Davis that he did not want Sullivan rehired for the repair department, but there is no proof that Sullivan ever reapplied or that Davis took any action or would have taken action pursuant to Cox's recommendation. In short, the proof does not show us that Cox's statements amounted to any more than the *suggestions* of "trusted nonsupervisory employees [who] often are looked to for such suggestions." *Northern Virginia Steel Corp. v. NLRB*, 300 F.2d 168, 172 (4th Cir. 1962).

Cox's role in granting time off and vacation time appears to be limited to relaying employee requests to management for their approval, and returning management's response; Cox's testimony does not suggest that Cox made independent determinations with respect to time off, or overtime work, for which he also sought the approval of his superiors. Cox stated that his requests to employees to work overtime was on a voluntary basis. Changes Cox made in the forms the repair department used, and the physical layout of the department, like rearranging the tables, did not involve decisions of the type enumerated in the statute which

**2.** According to the law judge's opinion, modifications are "adjustment[s] of still-functioning components which past experience showed might fail."

defines supervisory status. Cox's temporary performance of supervisory duties while Tom Davis, a supervisor, was absent on vacation does not imbue Cox with supervisory status. *NLRB v. Sayers Printing Co., supra,* 453 F.2d at 815. Though Cox alone was salaried initially, he testified that technicians in *other* departments were also salaried, and that when he suggested to Tom Davis that technician Hugh Davies, also in the repair department, be salaried, supervisor Davis told Cox he had *already* put in the request for that change.

Statements made to Cox and his co-workers in May and August of 1975, by the plant managers and Tom Davis, that Cox was thereafter "in charge," the "leadman," and "running" the department are less definitive than appear initially. On August 11, 1975, Cox was told he was thereafter a "leadman" in the repair department; at the same meeting, however, Tom Davis was made overall supervisor of several departments, including the repair department. According to Cox, these designations were made because there were problems in the repair department prior to the time he was appointed leadman. He testified that someone needed authority in the department to run things. Also, according to Cox, these problems were transferred from him to Tom Davis as a result of these designations. Cox also testified that plant manager Eddy said the problems in the repair department were going to possibly be resolved by naming Cox as leadman and Tom Davis as supervisor. Cox was not told what his new duties as leadman were; moreover, he continued doing repair work on equipment in the repair department.

The Supreme Court has recognized the existence of a group of nonsupervisory employees who nevertheless have slightly different duties than their rank and file co-workers. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 281, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1973). According to the Court, Congress intended that so-called "straw bosses" were to be included as protected employees under the terms of the Act as finally adopted. *See NLRB v. Bell Aerospace, supra,* 416 U.S. at 282–83, 94 S.Ct. 1757. In the absence of proof that Cox actually possessed or exercised one of the statutorily required indicia of supervisory authority, we do not regard statements that he was a "leadman" or "in charge" as determinative of our decision.

■ The rules relating to appellate review of Board determinations of this kind are familiar; a large measure of informed discretion is afforded the Board. *NLRB v. Little Rock Downtowner, Inc.,* 414 F.2d 1084, 1089 (8th Cir. 1969). Deference is given to the Board's findings concerning the " 'infinite and subtle' gradations of authority which determine who, as a practical matter, falls within the statutory definition of 'supervisor.' " *GAF Corp. v. NLRB,* 524 F.2d 492, 494 (5th Cir. 1975).

The Board's determination "will be accepted if it has ' "warrant in the record" and a reasonable basis in law.' " *NLRB v. Broyhill Co.,* 514 F.2d 655, 658 (8th Cir. 1975), *citing James H. Matthews & Co. v. NLRB, supra,* 354 F.2d at 435. The record however must reveal substantial evidence to support the Board's findings when viewed as a whole; in other words, all the evidence must be examined, including any evidence contrary to the Board's findings. *NLRB v. Sayers Printing Co., supra,* 453 F.2d at 815.

■ We have carefully reviewed the record in this case, and conclude that substantial evidence supports the conclusion of the law judge and the Board that Cox was not a supervisor within § 2(11) of the Act.[3]

Two prior cases before this court finding supervisory status present stronger factual records. In *NLRB v. Broyhill Co., supra,* 514 F.2d 655, it was shown that "McWilliams [the alleged supervisor] jointly participated with Lee Carter in the preparation of daily work schedules of each employee. McWilliams would then assign work projects to each employee throughout the

---

**3.** Respondent Harmon Industries, Inc. has not contested on this appeal the finding below that Dale E. Cox also was not a managerial employee.

day. When a task was completed, the employee was required to report then to McWilliams for another assignment. \* \* It was also McWilliams' responsibility to see that each employee performed his job properly and diligently." *Id.* at 658.

We compare also our opinion in *James H. Matthews & Co. v. NLRB, supra,* 354 F.2d 432, which sustained a finding of supervisory status:

> *Of controlling importance* is the testimony that ·the leadmen assign work to the employees in their departments; transfer · employees from job to job, as *necessary in their sole opinion; pass on employee requests for time off; effectively recommend discipline; and oversee the other employees' work, as well as checking its quality.*

*Id.* at 435 (emphasis added).

More like the facts in the present case are the facts in *NLRB v. Sayers Printing Co., supra,* 453 F.2d at 814, where we concluded that the two men in question, who "occasionally assigned employees 'to perform jobs," "sometimes directed pressmen . to clean their machines when they had no printing work to do," and "[o]n infrequent occasions \* \* \* assigned overtime," were merely carrying out the directions or policies established by management. *See also NLRB v. Little Rock Downtowner, Inc., supra,* 414 F.2d at 1089. *See generally Oil, Chemical & Atomic Workers v. NLRB,* 144 U.S.App.D.C. 167, 445 F.2d 237, 242 (1971), *cert. denied,* 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972); *Westinghouse Electric Corp. v. NLRB,* 424 F.2d 1151, 1157 (7th Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970); ·*NLRB v. Southern Bleachery & Print Works, Inc.,* 257 F.2d 235, 239 (4th Cir. 1958), *cert. denied,* 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575 (1959). Accordingly, we enforce the order of the Board in this 'case.