CITY OF DAVENPORT, Iowa, a Municipal Corporation, Appellant,

v.

PUBLIC EMPLOYMENT RELATIONS BOARD, an agency of the State of Iowa, Appellee,

v.

DAVENPORT ASSOCIATION OF PROFESSIONAL FIREFIGHTERS, Intervenor-Appellee.

No. 59399.

Supreme Court of Iowa.

March 22, 1978.

William B. Waterman, Davenport, for appellant.

Marie Condon and John L. Ayers, Des Moines, for appellee PER Bd.

Harry Smith of Smith & Smith, Sioux City, and J. Hobart Darbyshire of Carlin & Darbyshire, Davenport, for intervenor-appellee.

McCORMICK, Justice.

In this case of first impression in Iowa we must decide whether the trial court erred in affirming an order of the Public Employment Relations Board (PER Board) placing line captains and lieutenants in the bargaining unit of the City of Davenport fire department. The City contends the captains and lieutenants should be barred from the bargaining unit because they are supervisory employees. The PER Board ruled they are not supervisory employees, and the trial court held the ruling is supported by substantial evidence and was not induced by legal error. We affirm.

The Public Employment Relations Act became effective July 1, 1974, establishing a duty of state political subdivision public employers to bargain with their employees as of July 1, 1975.

The statute defines collective bargaining rights of Iowa public employers and employees; it provides for elections on organizational issues; it outlaws strikes and provides procedures for resolving disputes; it creates a regulatory system; and it establishes a new agency, the PER Board, to administer the law.

Various categories of public employees are denied bargaining rights under the statute. Among those excluded are "[r]epresentatives of a public employer, including the administrative officer, director or chief executive officer of a public employer or major division thereof as well as his deputy, first assistant, and *any supervisory employees.*" § 20.4(2), The Code, (emphasis supplied). The statute defines supervisory employee as follows:

Supervisory employee means any individual having authority in the interest of the public employer to hire, transfer, suspend, layoff, recall, promote, discharge, assign, reward or discipline other public employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. All school superintendents, assistant superintendents, principals and assistant principals shall be deemed to be supervisory employees. *Id.*

Pursuant to Code § 20.13, the Davenport Association of Professional Firefighters petitioned the PER Board in early 1975, seeking a determination of the appropriate bar-

gaining unit in the Davenport fire department. After hearing evidence, the Board ruled in November 1975 that the bargaining unit would include all firefighters, engineers, alarm operators, the record clerk, line captains, and lieutenants. The City petitioned for review in district court, challenging the inclusion of line captains and lieutenants in the bargaining unit. The trial court affirmed, and this appeal by the City followed.

This appeal presents three main questions. What is the nature and scope of judicial review of PER Board bargaining unit determinations? What legal principles are applicable in deciding who are supervisory employees under the statute? Is the PER Board decision in this case supported by substantial evidence?

■ I. *The nature and scope of judicial review.* In the absence of a specific statutory provision to the contrary, judicial review of agency action is governed by the Administrative Procedure Act (IAPA), Code chapter 17A. § 17A.19, The Code. The IAPA applies here.

■ Only one ground for judicial relief under the IAPA is invoked by the City in this case. It provides a remedy when the substantial rights of the petitioner have been prejudiced in a contested case by agency action which is "unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole". § 17A.19(8)(f). See *Taylor v. Department of Transportation*, 260 N.W.2d 521 (Iowa 1977). Review is at law, not de novo. *Hoffman v. Department of Transportation*, 257 N.W.2d 22, 25 (Iowa 1977).

The City contends the substantial evidence test under Code § 17A.19(8)(f) expands the court's duty beyond what it was when agency action was reviewed under prior practice in certiorari proceedings. This contention is based on the statutory language requiring the record to be viewed as a whole in applying the test. The City alleges only evidence supporting challenged agency action was required to be considered in certiorari cases. We do not find certiora-

ri review of agency decisions has been so truncated.

■ Certiorari review to ascertain the reasonableness of agency findings has required consideration of the entire administrative hearing record. See, e. g., *State ex rel. Employment Security Commission v. Merit Employment Commission*, 231 N.W.2d 854 (Iowa 1975); *Vohs v. District Commissioners of Fremont County*, 218 N.W.2d 595 (Iowa 1974); *Reed v. Gaylord*, 216 N.W.2d 327 (Iowa 1974); *Wonder Life Company v. Liddy*, 207 N.W.2d 27 (Iowa 1973); *Grant v. Fritz*, 201 N.W.2d 188 (Iowa 1972). We recognized this duty under a provision similar to § 17A.19(8)(f) in *Davenport Water Company v. Iowa State Commerce Commission*, 190 N.W.2d 583 (Iowa 1971); see *United Telephone Company of Iowa v. Iowa State Commerce Commission*, 257 N.W.2d 466, 469–470 (Iowa 1977).

■ Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion. *Grant v. Fritz*, supra, at 197. As provided in Code § 17A.19(8)(f), the entire record must be considered in determining whether the challenged finding has sufficient support. Nonetheless, the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Reisner v. Board of Trustees of Fire Retirement System*, 203 N.W.2d 812, 814 (Iowa 1973).

These principles are consistent with the U.S. Supreme Court's explanation of the federal APA and Taft-Hartley Act requirement that the whole record be examined in judicial review of National Labor Relations Board (NLRB) cases:

The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record.

\* \* \* \* \* \*

To be sure, the requirement for canvassing "the whole record" in order to

ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view. *Universal Camera Corporation v. National Labor Relations Board*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–465, 95 L.Ed. 456, 467–468 (1951).

These principles governing review of agency action must not be confused with those applicable to appellate review of a jury verdict or findings of fact of a trial judge in a law action tried to the court. We have said only supporting evidence need be considered in those cases. See *Hunt v. State*, 252 N.W.2d 715, 717 (Iowa 1977); *Grefe v. Ross*, 231 N.W.2d 863, 865 (Iowa 1975); *Meade v. Roller*, 212 N.W.2d 426, 429 (Iowa 1973).

■ As explained in *Universal Camera*, supra, the requirement of taking all evidence into account in reviewing administrative findings does not detract from the duty of courts to grant appropriate deference to agency expertise. The substantial evidence test accords respect to the expertise of the administrative tribunal and helps promote uniform application of the law. *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131, 141 (1966); *Grant v. Fritz*, supra, at 197.

The wisdom of this carefully circumscribed standard of review is demonstrated by the kind of problem involved in the present case. In recently upholding an NLRB determination of employee status, the U.S. Supreme Court noted:

[T]his conclusion applies to but one specific instance of the "[m]yriad forms of service relationship, with infinite and subtle variations in terms of employment, [which] blanket the nation's economy," and which the Board must confront on a daily basis. Accordingly, regardless of how we might have resolved the question as an initial matter, the appropriate weight which must be given to the judgment of the agency whose special duty is to apply this broad statutory language to varying fact patterns requires enforcement of the Board's order. *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 303–304, 97 S.Ct. 576, 580–581, 50 L.Ed.2d 494, 500–501 (1977).

Like the Iowa Public Employment Relations Act, the National Labor Relations Act excludes supervisory employees from the bargaining units affected by federal law. 29 U.S.C. § 152(3). In fact, the definition of supervisory employee in the Iowa statute is taken from the federal statute. See 29 U.S.C. § 152(11). Regarding NLRB application of the federal definition, the courts of appeal have said, "[G]radations of authority 'responsibly to direct' the work of others from that of general manager or other top executive to 'straw-boss' are so infinite and subtle that of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function to determine those who as a practical matter fall within the statutory definition of a 'supervisor'." *NLRB v. Swift and Co.*, 292 F.2d 561, 563 (1 Cir. 1961). See *NLRB v. Metropolitan Life Ins. Co.*, 405 F.2d 1169, 1172 (2 Cir. 1968); *NLRB v. Security Guard Service, Inc.*, 384 F.2d 143, 146 (5 Cir. 1967).

We believe similar deference is necessary under the Iowa statute. Therefore, in applying the substantial evidence test, we rec-

ognize the PER Board has a reasonable range of informed discretion within which to determine who are supervisory employees.

■ II. *Legal principles for determining who are supervisory employees.* Because the definition of supervisory employee in the Iowa statute is taken from the NLRA, we presume our legislature intended what Congress intended by the language employed. *Stromberg Hatchery v. Iowa Employment Security Commission,* 239 Iowa 1047, 1050, 33 N.W.2d 498, 500 (1948). " * * * [W]here * * * a state legislature adopts a federal statute which had been previously interpreted by federal courts it may be presumed it knew the legislative history of the law and the interpretation placed on the provision by such federal decisions, had the same objective in mind and employed the statutory terms in the same sense." *Hubbard v. State,* 163 N.W.2d 904, 910–911 (Iowa 1969). As a result, federal court decisions construing the federal statute are illuminating and instructive on the meaning of our statute, although they are neither conclusive nor compulsory. *Cassady v. Wheeler,* 224 N.W.2d 649, 652 (Iowa 1974).

The exclusion of supervisors from union membership in the NLRA was part of the Taft-Hartley Act of 1947. "The sponsors feared that unionization of foremen and similar personnel would tend to break down industrial discipline by blurring the traditional distinction between management and labor. It was felt necessary to deny foremen and other supervisory personnel the right of collective bargaining in order to preserve their unqualified loyalty to the interests of their employers, and to prevent the dilution of this loyalty by giving them common interests with the men they were hired to supervise and direct." *International Ladies' Garment Workers' Union AFL–CIO v. NLRB,* 339 F.2d 116, 122 (2 Cir. 1964). See *Beasley v. Food Fair of North Carolina, Inc.,* 416 U.S. 653, 661–662, 94 S.Ct. 2023, 2028, 40 L.Ed.2d 443, 450 (1974).

■ However, supervisory status is not to be construed so broadly that persons are denied employee rights which the statute is designed to protect. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 283, 94 S.Ct. 1757, 1766, 40 L.Ed.2d 134, 147 (1974); *GAF Corporation v. National Labor Relations Board,* 524 F.2d 492, 495 (5 Cir. 1975); *Westinghouse Elec. Corp. v. NLRB,* 424 F.2d 1151, 1158 (7 Cir. 1970), cert. denied, 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970) ("the Board has a duty to employees to be alert not to construe supervisory status too broadly"). Congress sought to exclude from employee status only those employees who were "the arms and legs of management in executing labor policies." *NLRB v. Security Guard Service, Inc.,* 384 F.2d 143, 147 (5 Cir. 1967). A statement from the Senate committee report shows this was the intent of Congress:

> [T]he committee has not been unmindful of the fact that certain employees with minor supervisory duties have problems which may justify their inclusion in the act. It has therefore distinguished between straw bosses, leadmen, set-up men, and other minor supervisory employees, on the one hand, and the supervisor vested with such genuine management prerogatives as to the right to hire or fire, discipline, or make effective recommendations with respect to such action. Sen. Rep.No.105, on S. 1126, 80th Cong., 1st Sess., p. 4.

■ Certain well-established principles have been developed in federal cases for determining who are supervisory employees under the NLRA. In adopting the federal definition of supervisor, we believe our legislature signified its intention that these principles be applied under our statute. See § 20.13(2), The Code.

■ The determination is ordinarily a fact question. It involves a case-by-case approach in which the agency gives practical application of the statute to the infinite and complex gradations of authority which may exist in employment. The agency's exercise of discretion will be accepted by reviewing courts if it has "warrant in the record" and a "reasonable basis in law."

*NLRB v. Broyhill Co.,* 514 F.2d 655, 658 (8 Cir. 1975).

The enumerated functions in the definition of supervisor are listed disjunctively; possession of any one of them is sufficient to make an employee a supervisor. *NLRB v. Broyhill Co.,* supra. The power must exist in reality, not only on paper. *NLRB v. Security Guard Service, Inc.,* supra, at 149. However, it is the existence of the power and not its exercise which is determinative. *Jas. H. Matthews & Co. v. NLRB,* 354 F.2d 432, 434 (8 Cir. 1965), cert. denied, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966). What the statute requires is evidence of actual supervisory authority "visibly translated into tangible examples * *." *Oil, Chemical and Atomic Workers Int. U. v. NLRB,* 144 U.S.App.D.C. 167, 173, 445 F.2d 237, 243 (1971), cert. denied, 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972).

In addition, "the statute expressly insists that a supervisor 1) have authority 2) to use independent judgment 3) in performing such supervisory functions 4) in the interest of management. These latter requirements are conjunctive." *NLRB v. Security Guard Service, Inc.,* supra, at 147. Consequently an employee is not a supervisor under the federal definition when he has the power to exercise or effectively recommend the exercise of listed functions unless this power is accompanied by authority to use independent judgment in determining how in the interest of management it will be exercised. Authority to perform one of the enumerated functions is not supervisory if the responsibility is routine or clerical. See *NLRB v. Wentworth Institute,* 515 F.2d 550, 557 (1 Cir. 1975); *NLRB v. Metropolitan Petroleum Co. of Massachusetts,* 506 F.2d 616, 618 (1 Cir. 1974).

The status determination depends upon how completely the responsibilities of the position identify the employee with management. For supervisory status to exist this identification must be substantial. *NLRB v. Doctor's Hospital of Modesto, Inc.,* 489 F.2d 772, 776 (9 Cir. 1973); *Ross Porta-Plant, Inc. v. NLRB,* 404 F.2d 1180, 1182 (5 Cir. 1968).

Repetitive or rote tasks are not considered supervisory. See, e. g., *NLRB v. Griggs Equipment Inc.,* 307 F.2d 275 (5 Cir. 1962). Nor are functions requiring little more than use of common sense. *Spector Freight System, Inc.,* 216 NLRB No. 89, 1974–75 CCH NLRB ¶ 15,485 (1975). An individual who merely serves as a conduit for orders emanating from superiors acts routinely. See, e. g., *Screwmatic, Inc.,* 218 NLRB No. 210, 1974–75 CCH NLRB ¶ 15,-953 (1975); *Samuel Liefer,* 224 NLRB No. 38, 1975–76 CCH NLRB ¶ 16,906 (1976), enforced, *NLRB v. Samuel Liefer,* 562 F.2d 38, (2 Cir. 1977).

Moreover, the directing and assigning of work by a skilled employee to less skilled employees ·does not involve the use of independent judgment when it is incidental to the application of the skilled employee's technical or professional know-how. In such a situation the skilled employee does not exercise independent judgment as a representative of management within the meaning of the statutory requirement. *Westinghouse Elec. Corp. v. NLRB,* 424 F.2d 1151 (7 Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 62 (1970); *Arizona Public Service Co. v. NLRB,* 453 F.2d 228 (9 Cir. 1971); *Beth Israel Medical Center,* 229 NLRB No. 32, 1977–78 CCH NLRB ¶ 18,148 (1977); *Kaiser Steel Corp.,* 221 NLRB No. 19, 1975–76 CCH NLRB ¶ 16,443 (1975); *Trustees of Noble Hospital,* 218 NLRB No. 221, 1974–75 CCH NLRB ¶ 15,980 (1975); *I–O Services, Inc.,* 218 NLRB No. 91, 1974–75 CCH NLRB ¶ 15,852 (1975).

The title a position carries has little bearing on whether it is supervisory. It is the function rather than the label which is significant. *Phillips v. Kennedy,* 542 F.2d 52 (8 Cir. 1976); *Arizona Public Service Co. v. NLRB,* supra; *NLRB v. Sayers Printing Co.,* 453 F.2d 810 (8 Cir. 1971); *Int'l Union of Elec., Radio, and Machine Workers v. NLRB,* 138 U.S.App.D.C. 249, 426 F.2d 1243, cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1970); *Ross Porta-Plant, Inc. v. NLRB,* supra.

■ Furthermore, the employee's regular functions and responsibilities are determinative. Temporary or occasional service as a supervisor is not disqualifying. "The test of whether a person is a supervisor depends not on what he may have as his responsibilities and authority under occasional or remote circumstances, but what his functions and responsibilities are in the normal course of affairs." *Matter of Borough of Naugatuck, (Fire Department),* Conn.St.Bd. of Labor Rel.Case No. ME–1651, 1668, Decision No. 812, CCH State Labor Law Reporter, ¶ 49,993.24 (June 27, 1968). Temporary service as a supervisor does not make a rank-and-file employee a supervisor. *NLRB v. Harmon Industries, Inc.,* 565 F.2d 1047, 1051 (8 Cir. 1977) (performance of supervisory duties while supervisor on vacation). An employee may be disqualified "only if his temporary service as a supervisor is a regular and substantial part of his job which cannot be 'sharply demarcated' from his rank-and-file duties." *GAF Corp. v. NLRB,* 524 F.2d 492, 496 (5 Cir. 1975).

III. *The merits of the PER Board decision in this case.* Davenport employs approximately 135 persons in its fire department. They are organized along military lines. At the head of the department is the fire chief, who is aided by an assistant chief. Under these two officers are a captain-training officer, a captain-mechanic, a captain-fire marshal, and five district chiefs. The PER Board held all these persons except the captain-mechanic are supervisory employees, and this holding is not disputed here.

Immediately below the five district chiefs in the command hierarchy are ten line captains and 20 line lieutenants who serve as company commanders. The normal complement of a company is the captain or lieutenant in charge, a chauffeur, and a firefighter. There are ten companies on each of the three 24-hours shifts. They serve in six fire stations located in various parts of the city. The central fire station houses three companies, two stations house two companies each, and three stations house one company each.

Under the shift rotation, a line captain is in charge of a company on one shift and line lieutenants take charge on the other two shifts.

Two district chiefs, with the assistant chief serving as district chief, serve with each shift. One district chief is based in the central station and the other is based at a station approximately 33 blocks away. Because of vacations and other necessities, line captains are called upon to act occasionally as district chief. As a result, each line captain acts as district chief approximately four weeks each year.

The PER Board made the following additional relevant findings of fact:

The operation of any line fire company may generally be divided into four functions: training, performance of house duties, inspections, and fire fighting. In all of these functions, the duties and responsibilities of captains and lieutenants are, for the most part, interchangeable; the functions themselves are in all cases the same, the only difference being whether the shift is headed by a captain or a lieutenant. In the areas of training, housework and inspections, the captain or lieutenant is in a general sense "in charge" of these activities, by virtue of his superior rank. In performing these functions, however, procedures and standards have been highly codified by Department Orders of the chief; these orders establish standardized procedures for nearly every activity performed at the company level, and extend even to such topics as how often mattresses are to be turned, and a directive that sheets and blankets be hung over the end of the bed and not be put away until the fire personnel have washed and shaved, so that these items are properly aired out before being put away.

The Davenport Fire Department distinguishes between two types of fires: a "still alarm" fire and a "general alarm" fire. A still alarm is generally a nonstructural fire, the most typical examples being a grass fire or fire in an automobile; a general alarm denotes a structural fire, i. e., one in a

building. In addition, a second alarm is, simply, a request for additional assistance, and a third alarm (or multi-alarm) denotes a situation in which all available equipment and personnel are called to duty. For extreme emergency situations, the city has agreements with the surrounding communities whereby outside assistance may be called.

A single company, headed by a captain or lieutenant, normally responds to a still alarm fire, except in certain circumstances delineated by Department Order. At a general alarm fire, while a company officer may first appear on the scene and therefore be in charge until a higher officer arrives, a district chief estimated that he arrives first approximately 80 per cent of the time, and only minutes behind in the remaining cases. Even in cases where the district chief does not arrive first, there is capability for close radio contact with the company officer until his arrival. Thus, in all cases except non-structural fires of a minor nature, a district chief is on the scene and has complete authority in directing all fire fighting activities. In all instances there are highly detailed and standardized procedures to be followed.

The district chief (and assistant chief who acts as one of six district chiefs) is the highest ranking officer working on a 24-hour shift basis. There are at all times two district chiefs on duty. As stated above, the district chief responds to all general alarms and is in charge of directing the fighting of those fires in the absence of the chief. In addition, the district chief has the authority to suspend employees without prior notification to or approval of the chief or assistant chief. The district chiefs are also involved in the decision-making process, by participation on a nine officer board with the chief, with respect to assignments to shifts and stations, promotions, and other personnel matters. By Department Order only the district chief, assistant chief, or chief has the authority to send an employee home because of illness, or to send him to the doctor.

While company captains are generally considered "in charge" of a station, with few exceptions the role of line captains and line lieutenants are identical. Thus, they are responsible for the company recordbook, a log of the time and equipment used for each alarm, for the requisition of supplies, and for the inspection of equipment. House duties consist of cleaning and maintenance of the buildings, grounds, and equipment; in most cases these "assignments" are determined by rank, and one lieutenant testified that a list of duties was always posted by rank, not by name, and he had no part in preparing or altering this list of house duties without direction from a higher ranking officer. The captain or lieutenant also on many occasions leads the training activities within the station, guided, however, by the directives of the chief, the department's training officer, and the training manuals. Inspection work is done according to a predetermined schedule, and the company officer (captain or lieutenant) performs the inspection work along with other company personnel.

Captains and lieutenants in the Davenport Fire Department have no authority to hire, transfer, suspend, layoff, recall, promote, discharge, assign, or reward other employees on their own motion. Their role in some of these matters must be addressed, however, as it relates to discipline, recommendations to superior officers and their capability to direct other employees and adjust employee grievances.

With respect to the authority to discipline, it is clear at the outset that in the paramilitary structure of a fire department, by virtue of their rank, captains and lieutenants command the respect of subordinate ranks. In the performance of housekeeping functions, the captain or lieutenant, as head of the shift, may inspect the work of the other employees, and require that they correct any deficiencies in that work. Their power to directly discipline, however is limited to a verbal reprimand or "chewing out," as it was often referred to in the record. If such a "chewing out" does not remedy the problem, the only formal action that can be taken by the captain or

lieutenant is to press charges against the alleged offender. This course of action, however, is available to all employees of the fire department; a fire fighter may likewise press charges against an officer, and, according to the testimony of the chief, the procedure used to resolve such charges would be identical in either case. In no case would suspension or discharge result without an independent investigation of the circumstances by the district chief and, probably, the chief as well. At the level of district chief or higher, it is possible that a disciplinary problem could result in the transfer, reassignment, suspension, or even discharge of an employee, but again, only after an independent review of the situation.

Promotional examinations are given pursuant to Iowa law at least every two years. As a preliminary matter, the captain or lieutenant submits a "rating report" of the men in his command who wish to take the examination. This report is passed on through the chain of command to the chief, and then to the civil service commission. The examination is then administered by the civil service commission which prepares a list of persons qualified for promotion. When a vacancy occurs, the board of chief officers (chief, assistant chief, district chiefs, training officer and fire marshal) review[s] the candidates as certified by the civil service commission and make[s] [its] selection from that list. At this stage, each candidate for the promotion has submitted a comparative rating of himself and all other candidates, and in addition, each member of the board of chief officers has rated the applicants. A decision is then made by the board of chief officers. The role of the original rating by the company officer was described by a district chief as minimal.

With respect to assignments and transfers, the record is clear that this function is exercised by the chief, often in consultation with the board of chief officers. Some testimony was also offered concerning individual transfers at the request or recommendation of a captain or lieutenant. One district chief testified that these requests arose in-frequently, perhaps at the most once or twice a year, were never in writing, but rather oral suggestions in conversation with a company officer, and were never passed upon without further investigation by the district chief—"I would probably go down to the station involved and get the parties together that were involved and get the whole story, and take it from there, depending on how serious it might be."

The chief of the department testified regarding two separate procedures for the handling of grievances: the first, most often applicable to a disagreement or personality clash between two employees; and the second, a more formalized procedure, whereby the employee organization has established a grievance committee to meet formally with the chief once per month and present its grievances to him. In the latter procedure, captains and lieutenants do not participate on behalf of the employer.

The captains' and lieutenants' responsibility to direct the work of other employees has been outlined above. Generally, it includes the responsibility for inspection of housework, the leading of training activities within the station, responsibility for the completion of house-to-house inspections, and the "command" of the company at still alarm fires where a district chief is not present. In addition, captains substitute for district chiefs when the latter are on vacation, ill, or otherwise absent. In these instances, captains exercise most of the authority of the district chief. It is estimated that district chiefs are absent a collective total of approximately 40 weeks per year; this would necessitate, on an average, that each line captain function as a district chief approximately four weeks per year.

In the Davenport Fire Department, the base pay for a lieutenant is $527 per year higher than that of a chauffeur; the difference between a captain and lieutenant is $542; and the difference between a district chief and captain is $1,873.

The Board included the following in its conclusions of law:

The sole issue left for determination, then, is the supervisory status of line lieutenants and captains. Although minor differences in their authority were noted, the Board does not perceive these differences as determinative of a different result for captains and lieutenants. For instance, the Board notes that a company captain is accountable for the company equipment, and that the captain may approve the trading of days within the company; neither of these items, however, are listed as supervisory indicia in [Code § 20.4(2)], and the Board does not believe that these responsibilities constitute a significant difference in authority between captains and lieutenants.

The record is clear that captains and lieutenants may not hire, transfer, suspend, layoff, recall, promote, discharge, assign, or reward employees on their own motion. They play no role in the hiring process; there is no record evidence that there has ever been a layoff or recall of employees in the Davenport Fire Department, or that captains and lieutenants would play a role in such procedures; and there is no evidence that a system exists for rewarding employees, other than the normal promotional process. While the Employer asserts that captains and lieutenants may play a role in the suspension or discharge of other employees, there is no evidence that a captain or lieutenant has ever made such a recommendation, and the basis of the Employer's assertion is that suspension or discharge could be a natural result of the department's disciplinary process. The areas which the Board must, therefore, address are the authority to 1) discipline other employees; 2) recommend transfers of employees; 3) recommend promotions; 4) direct other employees in their work; and 5) adjust employee grievances.

The authority of captains and lieutenants to discipline other employees is limited to a verbal reprimand or "chewing out". Thus, while other employees are expected to respect the higher rank of captains and lieutenants, the power of a captain or lieutenant to enforce his wishes is severely limited. In the instance where a verbal reprimand goes unheeded, the power to effectively discipline an employee, by discharge, suspension, or some lesser means, is beyond the authority of the captain or lieutenant. Even to the extent that the company officer might be able to "recommend" discipline, the form of that "recommendation" is unclear; it appears that it would most likely take the form of "pressing charges," which, as distinguished from a managerial prerogative, is a procedure available to all employees of the department without respect to rank. Further, even in the case where disciplinary action might result in suspension or discharge, the district chief can suspend employees only temporarily without the approval of the chief, and it is clear that even a temporary suspension would occur only after an independent investigation by the district chief. The authority to discharge lies only with the chief, subject ultimately to review by the civil service commission.

The overall responsibility to assign, reassign and transfer employees among companies and shifts belongs to the chief, and is most often exercised by him in consultation with the board of chief officers. Thus, on occasion, the board of chief officers meets and engages in a large-scale transfer and reassignment of personnel within the department; company officers play no part in this function. The record does show, however, that one company officer has orally "recommended" to a district chief that an individual employee be transferred. There is, however, no formalized procedure for such a recommendation by the company officer, and it is clear that where such a recommendation has been made, it has never been acted upon by the district chief without an independent investigation by him. The Board does not, therefore, perceive such a request by a company officer to constitute an "effective recommendation" within the meaning of [§ 20.4(2)]. *Cedar Falls Community School District,* PERB Case No. 26, April 17, 1975; *Davenport Community School District,* PERB Case No. 72, October 30, 1975.

Company officers' involvement in the promotional process is limited to the com-

pletion of a "rating report" for each employee who takes the promotional examination administered by the civil service commission. It is the civil service commission, however, which certifies to the department a list of qualified persons for promotion, and it is the board of chief officers which determines who will be promoted. The company officer is not consulted in making this determination, and the original rating report is given little, if any, weight in this decision; in no sense could this rating report be considered an "effective recommendation". *Davenport Community School District, supra.*

With respect to the direction of other employees, it is evident that company officers are in a general sense "in charge" of their shifts. The question to be addressed, however, is whether their direction of other employees requires the use of independent judgment or is of a more routine nature. In each of the functions other than the actual fighting of fires (i. e. training, housekeeping and inspections), every possible attempt has been made by the employer, in large part successfully, to standardize the procedures and requirements of those functions. Training is highly standardized, and the training requirements and overall training schedule are established above the rank of company officer; housekeeping functions are assigned according to rank and the company officer does not make these assignments; and house-to-house inspections are likewise performed pursuant to established standards and schedules, and the company officer participates in those inspections along with other employees. In all these matters, the department operates under very standardized and routinized procedures. The effect is that the amount of discretion and independent judgment to be exercised by the company officer is minimal at best. Through its rules and regulations, Department Orders, and other training and operations manuals, nearly all practices and procedures of the department are prescribed in such detail that these functions are, by any measure, routine, and the leadership exercised by a company officer does not, in the opinion of the Board, require the

use of independent judgment as contemplated by [§ 20.4(2)]. It appears, rather, that the role played by a company officer more nearly parallels the function of the leadman in the industrial sector, holding by definition some responsibility beyond that of the rank and file employee, but less authority than that of the true supervisor. *Cedar Falls Utility,* PERB Case No. 4, March 27, 1975.

In the direction of fire fighting activities, it is equally clear that the direction of this work by a company officer does not require the use of independent judgment as contemplated by the supervisory definition of [§ 20.4(2)]. First, in any structural fire the district chief is present and, by Department Order, required to be in charge of the fire fighting activities. And in the occasional instance where the district chief arrives several minutes later than the company, the decisions to be made by the company officer are the size of the hose required, the source of water and the direction of attack. These decisions are, obviously, important ones; but they are also routine decisions, in that the company officer, as well as most other experienced fire fighters, knows from rote training and experience the determinations he must make. Likewise, in still alarm fires, where the company officer is in command, the decisions to be made are also routine; they are not managerial decisions made in the interest of the Employer, but rather are tactical decisions, routine in nature and learned from extensive training and experience. Again, while in some instances the company officer may direct other employees in fire fighting activities, it is the opinion of the Board that such direction does not require sufficient use of independent judgment in the interest of the Employer to ascribe supervisory status.

Finally, the Employer contends that company officers must be found to be supervisors because they can adjust employee grievances. The chief testified regarding two separate procedures for the handling of "grievances." The first involved company officers and the entire chain of command in settling personality conflicts and other dis-

putes among employees; the second is a formalized procedure whereby the association presents its grievances to the chief. In this latter process, company officers play no part on behalf of the Employer; the Employer's assertion, therefore, that company officers may adjust grievances relates primarily to their handling of personality clashes within their station.

While the term "grievance" is one of uncertain content, with many collective bargaining agreements containing their own definition of grievances, Robert's Dictionary of Industrial Relations, Revised Edition, defines a grievance as "any complaint by an employee or by a union concerning any aspect of the employment relationship." The key element of this definition is the meaning of the words "employment relationship"; thus, the term "grievance" contemplates a dispute with the employer *over the terms and conditions of employment.* Hence the Board believes that the authority of a supervisor to adjust grievances in the interest of the public employer, through the use of independent judgment, contemplates a level of responsibility and authority greater than that exercised in settling arguments or disputes between two employees. There is a formalized grievance system in the Davenport Fire Department; within that system captains and lieutenants play no role on behalf of their employer.

In substituting for district chiefs, it is conceded that captains do exercise supervisory authority; by definition, however, this is authority which resides in the rank of district chief and is exercised by captains only when they temporarily substitute in that position. Under the circumstances of this case, the Board does not believe that the occasional exercise of supervisory authority only when substituting for a superior should in and of itself ascribe supervisory status to that lower rank.

From all of the foregoing, then, the Board concludes that while company officers do have responsibilities beyond that of the rank and file employee, they do not possess the requisite authority to act in a supervisory capacity on behalf of the Employer. In one of the few cases involving fire fighters which the National Labor Relations Board has considered, it reached, under facts not dissimilar to those presented here, a similar conclusion:

The Employer also contends that fire captains are supervisors within the meaning of the Act and therefore should be excluded from the unit. The record evidence shows that with respect to organization the fire department operates under the direction and control of the fire chief. Reporting directly to the fire chief are two assistant chiefs who in turn are assisted by two battalion chiefs. The fire chief, assistant fire chiefs and battalion chiefs are all admitted supervisors. Below the battalion chiefs are eight fire captains and approximately 35 firemen. The fire captains, whose status is in dispute, have no authority to hire or discharge employees or effectively to recommend such action. If a fireman commits an infraction which is in direct contravention of department rules, the fire captain can take action which may result in the employee's suspension; however, it would appear that all such disciplinary matters are subject to an independent investigation and review and that the fire captain has no definitive role to play in the ultimate resolution of such matters. The fire captains are directly responsible for the training of firemen and the upkeep and maintenance of the department's fire equipment. Fire captains also have the authority to direct fire fighting operations in the rare instances when no superior officer is present. However, in carrying out this responsibility, fire captains follow the routine operating procedures of the department and have little opportunity to exercise independent judgment. Accordingly, we find that the fire captains are more in the nature of leadmen than supervisors, and therefore, we shall include them in the unit. *Leland Stanford, Jr. University,* 194 NLRB No. 187, 79 LRRM 1356 (1972).

It is noted, moreover that in some respects the fire captains in *Stanford* possessed an

even greater degree of authority than company officers in the instant proceeding.

In view of the foregoing, the Board finds that line captains and line lieutenants are not supervisors within the meaning of [§ 20.4(2)].

■ In contending the Board erred in including line captains and lieutenants in the bargaining unit, the City alleges the record establishes five statutory job functions performed by those officers, any one of which would make them supervisory employees under Code § 20.4(2). It asserts that the Board's contrary findings are unsupported by substantial evidence and that captains and lieutenants as a matter of law have 1) authority to discipline, 2) authority to assign and effectively recommend transfer, 3) authority effectively to recommend promotion, 4) responsibility to direct other employees, and 5) responsibility to adjust grievances.

■ (1) *Authority to discipline.* For an employee to be a supervisor based on authority to discipline, he must have more than the power to issue verbal reprimands. More is necessary than the respect commanded by a leadman or straw boss. *Sweeney & Co. v. NLRB,* 437 F.2d 1127 (5 Cir. 1971); *NLRB v. Sayers Printing Co.,* 453 F.2d 810 (8 Cir. 1971); *NLRB v. Magnesium Casting Co.,* 427 F.2d 114 (1 Cir. 1970), aff'd, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971); *Doctors Hospital,* 217 NLRB No. 87, 1974–75 CCH NLRB ¶ 15,688 (1975); *Wing Memorial Hospital Association,* 217 NLRB No. 172, 1974–75 CCH NLRB ¶ 15,749 (1975); *St. Mary's Hospital, Inc.,* 220 NLRB No. 92, 1975–76 CCH NLRB ¶ 16,271 (1975); see *Meat and Provisions Drivers Union,* 224 NLRB No. 40, 1975–76 CCH NLRB ¶ 16,825 (1976); *Kaiser Steel Corp.,* 221 NLRB No. 19, 1975–76 CCH NLRB ¶ 16,443 (1975).

■ The record here provides substantial support for the Board finding that this is the extent of a line captain or lieutenant's authority to mete out discipline. Even though these officers can press a charge with the district chief, every other member of the company has the same right. This does not constitute the power to discipline or effectively to recommend discipline. *NLRB v. Imperial Bedding Co.,* 519 F.2d 1073 (5 Cir. 1975).

The PER Board was not obliged as a matter of law to sustain the City's position on this ground.

■ (2) *Authority to assign and effectively recommend transfer of employees.* Assigning employees to work on a routine basis is insufficient to create supervisory status, because it does not require independent judgment within the meaning of the statutory definition. See e. g., *NLRB v. W. C. McQuaide, Inc.,* 552 F.2d 519 (3 Cir. 1977) (assignments made on basis of dockworkers' availability held routine); *NLRB v. Harmon Industries, Inc.,* 565 F.2d 1047, 1050 (8 Cir. 1977) (assignment of work on basis of availability of employee time held to be routine); *Precision Fabricators, Inc. v. NLRB,* 204 F.2d 567 (2 Cir. 1953); *Doctor's Hospital,* 217 NLRB No. 87, 1974–75 CCH NLRB ¶ 15,688 (1975) (assignments made either on a first-come basis or on a rotating basis among members of a team held to be routine).

Substantial evidence supports the PER Board finding that line captains and lieutenants are not supervisors on this ground.

■ Similarly, the Board was warranted in finding the officers could not effectively recommend transfer of employees. The Board defines an effective recommendation as one which under normal policy and circumstances, is made at the chief executive level or below and is adopted by higher authority without independent review or de novo consideration as a matter of course. We believe this is an appropriate interpretation of the concept. So viewed, a mere showing that recommendations for transfer were ultimately followed does not make such recommendations "effective" within the meaning of the statute. In any event, substantial evidence supports the Board's finding that transfer decisions are normally made only after independent investigation by superior officers.

(3) *Effective recommendation of promotions.* As shown in the Board findings, supported by substantial evidence, evaluations of promotional candidates by line captains and lieutenants have little weight in actual practice in the ultimate decision whether an employee will be promoted. After the candidate passes the civil service examination, the board of chief officers independently makes the decision whether he will be promoted. Because the procedures which occur subsequent to the commanding officer's report constitute the determinative part of the process, the record sufficiently supports the Board finding that the company officers' reports do not constitute an effective recommendation as to promotion.

(4) *Responsibility to direct other employees.* In *NLRB v. Security Guard Service, Inc.,* 384 F.2d 143, 147 (5 Cir. 1967), the court said, "[T]he statutory words 'responsibility to direct' are not weak and jejune but import vigor and potential vitality." The responsibility must be substantial and pervasive enough to make the employee a part of management, not simply a leadman or straw boss. *NLRB v. Harmon Industries, Inc.,* 565 F.2d 1047, 1051 (8 Cir. 1977) (" * * * Congress intended that so-called 'straw bosses' were to be included as protected employees * * *."). As observed in *Security Guard Service, Inc.,* supra at 149, " * * * [T]o point to one act as supervisorial is pertinent and relevant but is not irrefutable. Nearly every employee at some time, under certain conditions, tells someone else what to do. A supervisor may be vested with plenary power and rarely exercise it, but one who engaged in an isolated incident of supervision is not necessarily a supervisor under the Act. If this were the criterion and hallmark of supervision, then practically all employees would be supervisors. This Congress did not intend." The court also observed, "Every order-giver is not a supervisor. Even the traffic director tells the company president where to park his car." *Id.* at 151.

In addition, responsibility can be so proceduralized that it becomes routine and does not involve the exercise of independent judgment. *NLRB v. Detroit Edison Co.,* 537 F.2d 239 (6 Cir. 1976).

Under these principles we do not think the PER Board was compelled as a matter of law to hold that line captains and lieutenants were supervisory employees on this ground. It was reasonable for the Board to conclude that directing chauffeurs and firefighters did not make the captains and lieutenants supervisors within the meaning of the statute.

Although the City relies on examples of general alarm situations where captains were in charge at fire or rescue scenes, testimony disclosed those captains were acting in the temporary capacity of district chief on most of these occasions. As previously noted and as held by the Board, such temporary service does not make those captains supervisors. A few additional isolated and exceptional instances in which captains or lieutenants may have performed supervisory acts at fire scenes constitute pertinent, but under the *Security Guard* case, not irrefutable evidence of their status.

Moreover, although fire fighting is serious, requires extensive training, courage and skill, the company commander could reasonably be viewed by the Board as a leadman or straw boss. His leadership role in fire fighting rests on his skill and experience rather than on a need for him to be in that position to carry out the City's labor policy.

The fire company is a team, usually having only three members including the captain or lieutenant. The members sleep in a dormitory, cook and eat together, share meal expenses, split household and maintenance duties, take turns conducting training sessions, rotate inspection duties, and depend on each other to carry out all prescribed functions, including fire fighting, as a matter of rote, training and standard procedure. As the designated leader of the cohesive and tightly-knit unit, a company officer cannot be said necessarily to be allied in interest more with management than labor.

323

In contending the company officer is a supervisor, the City also relies on evidence showing the next highest officer, the district chief, is not likely to spend very much time at stations other than the one where he offices. There was countervailing evidence showing orders from superiors frequently are given the stations in writing, are posted, and are required to be read and initialed by each employee, including the station commander. Additional evidence shows radio communication between the district chief and each station is available at all times.

 While time spent in the absence of a supervisor is clearly a consideration in determining an individual's supervisory status, it is not conclusive. See, e. g., *NLRB v. City Yellow Cab Co.,* 344 F.2d 575, 581 (6 Cir. 1965) (where company's supervisors lived in the city and could be reached by telephone in emergencies, "[t]he fact that at night and at other times no representatives of management were present at respondents' offices * * * does not necessarily mean that the switchboard operators were supervisors and a part of management"); *Oil, Chemical and Atomic Workers Int. U. v. NLRB,* 144 U.S.App.D.C. 167, 445 F.2d 237 (1971), cert. denied, 404 U.S. 1039, 92 S.Ct. 713, 30 L.Ed.2d 730 (1972); *NLRB v. Monroe Tube Co., Inc.,* 545 F.2d 1320 (2 Cir. 1976); *Western Medical Enterprises, Inc.,* 217 NLRB No. 183, 1974–75 CCH NLRB ¶ 15,754 (1975) (classification resulting in two shifts operating without supervisors held reasonable); *Spector Freight System, Inc.,* 216 NLRB No. 89, 1974–75 CCH NLRB ¶ 15,485 (1975); *Samuel Liefer etc.,* 224 NLRB No. 38, 1975–76 CCH NLRB ¶ 16,906 (1976), enforced, *NLRB v. Samuel Liefer,* 562 F.2d 38, 82 L.C. ¶ 10005 (2 Cir. 1977). Because of the tightly regimented and highly proceduralized nature of fire station duties, it was not unreasonable within the meaning of the substantial evidence test for the Board to refuse to hold company officers are supervisors in spite of consequent physical absence of a management representative from the majority of stations much of the time.

(5) *Responsibility to adjust grievances.* The evidence on the issue of company officers' responsibility to adjust grievances is summarized in the hearing officer's findings of fact. As revealed in his ruling, he held these commanders play no role in adjusting grievances involving terms and conditions of employment.

Adjusting a grievance involves an inquiry into its validity, a determination on the merits, and the taking of corrective action when necessary. See, generally, *NLRB v. Brown and Sharpe Mfg. Co.,* 169 F.2d 331, 334 (1 Cir. 1948).

 Preliminary efforts by station commanders to resolve minor grievances do not make them supervisors. See *NLRB v. City Yellow Cab Co.,* 334 F.2d 575 (6 Cir. 1965).

Two kinds of grievances were discussed in the testimony. One relates to employer-employee disputes concerning terms and conditions of employment. The other relates to disputes between employees.

The record establishes without contradiction that the fire chief has reserved to himself full authority to represent the City in adjusting employer-employee grievances. Therefore, substantial evidence supports the hearing officer's finding that station commanders lack responsibility to adjust employer-employee grievances or effectively to recommend the manner in which they should be adjusted by superiors.

The second category of grievance does not involve the potential adversary relationship between employer and employee which inheres in the first type. The handling of these problems by station commanders, largely by "talking them out", is routine and nonsupervisory within the meaning of § 20.4(2). See *Cinch Mfg. Corp.,* 98 NLRB No. 118, 29 LRRM 1407 (1952).

We find the PER Board's decision holding line captains and lieutenants are nonsupervisory is supported by substantial evidence when the record is viewed as a whole.[1]

1. Even if the substantial evidence test were not applicable here and the City did not have that hurdle to overcome, its position has little support even in the agency decisions upon which it

This was a close case for the PER Board, but that agency exists to decide such cases. The situation is different when the decision is taken to court for review. We agree with the statement of the court in *NLRB v. Magnesium Casting Co.,* 427 F.2d 114, 118 (1 Cir. 1970), aff'd 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971), that, "[I]f 'deference to expertise' and 'substantial evidence' mean anything in this area of labor law, it is that courts should not substitute their judgment in the close cases." We follow that admonition here.

AFFIRMED.

All Justices concur except REYNOLDSON, LeGRAND and REES, JJ., who dissent.

REYNOLDSON, Justice (dissenting).

I respectfully dissent for the same reasons expressed in my dissent in *City of Des Moines v. PER Board,* filed today.

LeGRAND and REES, JJ., join this dissent.

relies. The principal NLRB decision in point, cited by the PER Board in its ruling, is *Leland Stanford Jr. University,* 194 NLRB No. 187, 79 LRRM 1356 (1972). It supports the PER Board decision. Upon analysis of the job functions of officers excluded from bargaining units in the majority of other agency decisions, the line between supervisory and nonsupervisory employees is drawn just below the level of the position which is the functional equivalent of district chief in the present case. See *Basic Management, Inc.,* 104 NLRB No. 133, 32 LRRM 1191 (1953); *In Matter of Greenville Fire District, N. Y.* PERB Case No. C–0954 (1973); *In the Matter of Barnard Fire District, N. Y.* PERB Case No. C–0506 (1970); *City of Ames, Iowa,* PERB Case No. 515 (1976); *City of Newton, Iowa,* PERB No. 534 (1976); contra, *City of Grand Island v. American Federation of State, County and Municipal Employees,* 186 Neb. 711, 185 N.W.2d 860 (1971) (legislatively overruled, see *Local Union No. 647 v. City of Grand Island,* 196 Neb. 693, 244 N.W.2d 515 (Neb.1976)); *Hawaii Fire Fighters Assn., Hawaii,* PERB No. 437 (1972).