Mary Jean HAWK, Appellee,

v.

JIM HAWK CHEVROLET–BUICK, INC.,
and Universal Underwriters Insurance
Company, Appellants,

and

Iowa Industrial Commissioner,
Respondent.

No. 62286.

Supreme Court of Iowa.

July 25, 1979.

Rehearing Denied Aug. 24, 1979.

Peter J. Peters, Council Bluffs, for appellants.

Verne Lawyer of Lawyer, Lawyer & Jackson, Des Moines, and Kenneth Sacks of Perkins, Sacks & Hannan, Council Bluffs, for appellee.

McGIVERIN, Justice.

Mary Jean Hawk claims workers' compensation death benefits based upon the injury and death of her husband, James Hawk II, on September 28, 1973 in a private airplane crash near the Council Bluffs airport. The main question in this appeal is whether commission of "an unusual and rash act" by an employee which results in injury causes that injury not to arise out of and in the course of the employment within the meaning of the workers' compensation law. The deputy industrial commissioner held the death compensable. In a review decision, however, the industrial commissioner applied the unusual and rash act doctrine to deny compensation. On judicial review the district court reversed the industrial commissioner. We affirm the district court.

This is another phase of the same airplane accident that was the subject of *Jim Hawk Chevrolet-Buick, Inc. v. Insurance Company of North America*, 270 N.W.2d 466 (Iowa 1978), wherein we denied recovery under a property insurance policy on the aircraft.

■ We are bound by the industrial commissioner's findings of fact when they are supported by substantial evidence.

Our initial problem, which will be discussed later, involves the form of the industrial commissioner's review decision. In considerable detail the commissioner stated the facts and law pertaining to Hawk's death and claimant's entitlement to benefits. Near the end of the lengthy decision, however, the commissioner specifically labeled only the following as "findings of fact":

It is found and held as findings of fact:
That the decedent was at a prohibited place at the time of his accident and therefore not in the course of his employment.

That the actions of the decedent constitute a hazardous rash and unusual act and therefore did not arise out of his employment.

Therefore, recovery must be and is hereby denied to the claimant.

To assist in understanding the issues, we state the operative facts on which there is no substantial disagreement among the parties and commissioner.

The decedent, James Hawk II, was president, sole stockholder, chief operating officer and an employee of Jim Hawk Chevrolet-Buick, Inc., an automobile sales dealership in Denison that sold vehicles throughout southwest Iowa. He lived in Denison with his wife, Mary Jean Hawk, and two children.

On September 27, 1973 Hawk flew his private plane to Council Bluffs on business for his company. On September 28, at about 2:30 a. m., Hawk was killed when his plane crashed shortly after takeoff on an intended return trip to Denison.

At the time of the fatal crash Hawk held a student pilot certificate. He had logged 53.9 hours of flight time involving 20.2 solo hours and .8 nighttime hours. He was restricted by his student certificate to a radius of 25 miles from the Denison airport, although he could be "signed off" by the instructor for solo cross country flights. On the days relevant here, however, Hawk had not been "signed off." Log books show Hawk had been last authorized for cross country flight on September 4, 1973.

On September 27 Hawk and his business associate, Mark Crampton, drove to the Denison airport. Each drove a separate car in order that a car could be left at the airport for Hawk's use the next day. According to Crampton, Hawk planned to return to Denison in the early morning hours and use the waiting vehicle to return to his home where Crampton would meet him and accompany him to work for a sales meeting at 9:00 a. m.

Hawk left the Denison airport that afternoon and arrived in Council Bluffs around

5:45 p. m. He was met at the airport by Robert McIntyre, a car dealer. They proceeded from the airport to McIntyre's place of business where they examined two cars Hawk was considering for his customers.

After discussing the cars, McIntyre and Hawk went to the Lakeshore Country Club for dinner. Upon arrival the two men encountered friends with whom they ate and drank. Before dinner Hawk discussed the sale of two vehicles with William Cutler, another friend and business associate, with whom he had planned to meet in Council Bluffs.

While at the club Hawk and McIntyre were invited to a stag party for a friend in Omaha. McIntyre declined but Hawk left with Harry Sayers, another auto dealer. Before Hawk left, McIntyre offered him a place to stay for the night.

Sayers testified he and Hawk stayed at the party about one hour until 11:30 or 12:00 p. m. when they left for Sayers' office. Although both men had drinks at the party, neither continued drinking thereafter. Sayers and Hawk visited at Sayers' office on auto sales conditions and other matters until 1:30 a. m. when Hawk decided to return to the airport and fly back to Denison. The two men argued over whether Hawk should fly back at that hour. Because Hawk insisted on leaving, Sayers agreed to take him to the airport.

Weather conditions at the Council Bluffs airport in the early morning hours of September 28, 1973 were not good for flying. Although ground visibility was between four and five miles, the sky was overcast with rain and fog. Hawk told his friend Sayers to wait while Hawk circled the airport to check out the weather. The plane disappeared up into the fog and then crashed. Hawk was dead at the scene.

Analysis of body fluid drawn from Hawk's body showed a blood alcohol content of .147 per cent ethyl alcohol. FAA regulations prohibit flight within eight hours following alcohol consumption.

Charles Hawley, Hawk's flight instructor, testified Hawk was not instructed to fly by instruments and could not have interpreted any instrument readings. Hawley further testified that, according to FAA studies, noninstrument pilots who fly without the horizon in sight inevitably develop vertigo and lose control of the craft regardless of prior consumption of alcoholic beverages.

Mary Jean Hawk filed an application for arbitration of her claim for dependent's workers' compensation benefits with the industrial commissioner. After receiving an adverse review decision from the commissioner who had reversed the deputy, she filed petition for judicial review in district court. The court ruled workers' compensation should be awarded. Appeal to us by the employer and insurance carrier is under section 17A.20, The Code 1977.

The following issues are presented for our review:

(1) Whether the commissioner's findings and holdings that the death of Hawk did not arise out of and in the course of his employment are findings of fact or conclusions of law; and

(2) Whether the commissioner's conclusions that the actions of Hawk were unusual and rash and that he was in a prohibited place are legally sufficient to bar recovery of workers' compensation benefits.

I. *Effect of the commissioner's findings and holdings.* As an initial step to resolution of this case, we must determine which issues are factual and which issues are legal. This distinction is critical in evaluating the binding force of agency determinations on the district court and, in turn, the binding force of agency determinations on us. Once this distinction is clear, we will proceed to evaluate the merits of the unusual and rash act doctrine which is the crux of this case.

District court review of agency fact findings in this case is governed by section 17A.19(8)(f), which provides:

8. The court may affirm the agency action or remand to the agency for further proceedings. The court shall reverse, modify, or grant any other appropriate relief from the agency action, equi-

table or legal and including declaratory relief, if substantial rights of the petitioner have been prejudiced because the agency action is:

.　　.　　.　　.　　.

f. In a contested case, unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole . . . .

This substantial evidence test is the same standard which applied to review of agency action prior to enactment of the Iowa Administrative Procedure Act. Both before and after enactment of section 17A.19(8)(f), the court stands obligated to review the record as a whole to determine the reasonableness of agency findings. *City of Davenport v. Public Employment Relations Board,* 264 N.W.2d 307 (1978). "Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion." *Id.* at 311.

█ In order for an injury or death to be compensable, it must occur within the scope of employment. Injury or death within the scope of employment, in turn, must both arise out of and occur in the course of employment. § 85.3, The Code. *McClure v. Union, et al., Counties,* 188 N.W.2d 283, 287 (Iowa 1971). *See Cedar Rapids Community School v. Cady,* 278 N.W.2d 298, 299 (Iowa 1979).

█ The determination whether an injury or death arose out of or in the course of employment consists of a mixed question of law and fact. The operative events which gave rise to the injury or death are questions of fact. Where these issues are either resolved or undisputed, and supported by substantial evidence, the legal question whether the facts justify an award or denial of benefits remains. This distinction was made in *McClure* where we said:

The industrial commissioner's findings of facts are conclusive where the evidence is in dispute or reasonable minds may differ on the inferences fairly drawn

from the facts. . . . However, where the facts are not in dispute and different inferences could not be reasonably drawn therefrom it becomes a question of law and the court is not bound by the commissioner's findings or conclusions.

188 N.W.2d at 284.

In the present case the facts are undisputed and not susceptible to different inferences. As *McClure* points out, the controlling issue, therefore, is a legal determination. *Cf. Cady,* 278 N.W.2d at 298–299 (review on legal issue whether assault by deranged employee arises out of employment within the meaning of worker's compensation law). We must decide whether the "unusual and rash act" doctrine can be correctly applied in Iowa to deny recovery of benefits on the basis of the facts surrounding Hawk's death.

The industrial commissioner, while setting out the operative events in his review decision, failed to designate the events as "findings of fact."[1] The commissioner, instead, erroneously reserved that label for the bald conclusion that the death did not arise out of or in the course of employment. We decline, however, to remand this case, which has been in litigation since 1974, for appropriate labeling of findings of fact and conclusions of law. We, therefore, will treat the statements contained in the commissioner's review decision as findings of fact which, since they are supported by substantial evidence in the record, are binding on us.

With this delineation of law and fact, we turn to the merits of the substantive issue.

II. *The unusual and rash act doctrine.* On judicial review to the district court the commissioner's application of the unusual and rash act doctrine to bar Hawk's widow's benefits was reversed. In this appeal we are asked to review the continued vitality of this doctrine.

---

1. We again stress the need and duty of an agency to make detailed findings of fact and conclusions of law, clearly so labeled, to assist us in appellate review to know the exact basis for the agency decision and the impact on our review. *See Second Injury Fund v. Mich. Coal Co.,* 274 N.W.2d 300, 304 (Iowa 1979).

The statutory defenses to recovery of worker's compensation benefits are set out in section 85.16, The Code, which provides:

No compensation under this chapter shall be allowed for an injury caused:

1. By the employee's willful intent to injure himself or to willfully injure another.

2. When intoxication of the employee was the proximate cause of the injury.

3. By the willful act of a third party directed against the employee for reasons personal to such employee.

Appellants raised the defenses stated in section 85.16(1) and (2) before the deputy and commissioner and received adverse rulings. They do not urge those statutory defenses before us.

The thrust of appellants' position before this court is that Hawk's death did not arise out of and in the course of his employment due to his "unusual and rash act" of flying his plane in the early morning hours of September 28.

Although the statute does not address the impact of unusual and rash acts on the part of employees, case law has addressed this issue. The leading case in this jurisdiction is *Christensen v. Hauff Brothers*, 193 Iowa 1084, 188 N.W. 851 (1922). In *Christensen* a Hauff employee made a business trip from Struble, Iowa, to Hinton. It was understood Christensen would return to Struble by train. Christensen did not catch the early morning passenger train but, nevertheless, decided to take a freight train scheduled to leave about one and one half hours later. The freight consisted of twenty eight freight cars and one caboose designed to accommodate passengers. Christensen was discussing business nearby when the freight began to pull out at between eight and ten miles per hour. Although the caboose, alone, had steps and a handrail for boarding, Christensen did not wait for the caboose. He attempted to board a flat car and was thrown under the wheels and killed. This court denied compensation for the death saying:

An injury * * * "arises out of" the employment when there is apparent to the rational mind, upon consideration of all the circumstances a causal connection between the conditions under which the work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work, and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises "out of" the employment. *But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause, and which comes from a hazard to which the workmen would have been equally exposed apart from the employment.* The causative danger must be peculiar to the work, and not common to the neighborhood. It must be incidental to the character of the business, and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence.

.     .     .     .     .

That the workman was negligent, even grossly negligent, and acted in flagrant disregard of his bodily safety, is readily apparent. But freedom from negligence is not required to be shown in behalf of the workman, and negligence of a workman is not a defense under the act. To defeat recovery, it must "appear that such negligence was willful, and with intent to cause injury; or the result of intoxication on the part of the injured party." No question of willful misconduct arises in the case. *The sole question in the case is whether the accident and consequent injury arose out of and in the course of the workman's employment.* However, it is most material and pertinent to inquire: Is there anything peculiar to the hardware and implement business suggesting the rash venture which sacrificed Christensen's life, and was there causal connection between the con-

ditions under which this work was required to be performed and the resulting injury? Upon what reasonable basis may it be assumed that this workman, as a requirement of his occupation, was in any degree justified in the attempt to board the train as he did, instead of going into the caboose? . . .

There was no justification for Christensen's attempt to board the freight train by mounting the flat car in a most unusual manner, and for reasons wholly unjustifiable. In attempting to jump onto the flat car, he was not at a place where he might reasonably be, *doing what a man so employed might reasonably do.* We cannot conceive that Christensen's employment contemplated or comprehended any such unusual and rash act. If Henry Christensen, in attempting to board the flat car, was performing an act reasonably required by his employment, his injury and consequent death might be said to have causal connection with his employment, and therefore to arise out of his employment. In other words, if, upon consideration of all the circumstances, there existed causal connection between the conditions under which Christensen's work was required to be performed and the resulting injury, it could then be said that he was, at the instant of the injury, within the scope of his employment. If the conclusion may be logically reached that the workman's injury followed as a natural incident of his work, and was reasonably contemplated in his employment, then it may be said to have arisen out of employment. But we think such conclusion not reasonably possible. *We think it could not have been contemplated. in this relationship of employer and workman, disclosed by the facts and circumstances in this case, that Christensen would do the hazardous and rash act which he did.* There was nothing in his engagement requiring such an act. We think it cannot with any reason be said that the injury and consequent death of the workman arose out of his employment.

*Id.* at 1089–92, 188 N.W. at 853–54. (Emphasis added.)

Under the *Christensen* reasoning, an employee who, by an unusual and rash act, exposes himself to a risk not occasioned by the nature of the employment and sustains injury, acts outside the scope of his employment. Since articulation of the principle in 1922, however, this case has been frequently distinguished. In *Pohler v. T. W. Snow Construction Co.*, 239 Iowa 1018, 33 N.W.2d 416 (1948), this court refused to apply *Christensen* where a workman attempted to crawl between standing railroad freight cars and was fatally injured when the train started to move. Distinguishing *Christensen*, we ruled the case more nearly resembled commission of a negligent rather than an unusual and rash act. *Id.* at 1027, 33 N.W.2d at 421. *See Knipe v. Skelgas Co.*, 229 Iowa 740, 294 N.W. 880 (1940) (selection of air travel to make business trip not an unusual and rash act); *Sachleben v. Gjellefald Construction Co.*, 228 Iowa 152, 290 N.W. 48 (1940) (Miller, J., dissenting) ("Personally, I am unable to agree that the facts were sufficient to avoid the application of the rule announced by us in *Christensen* . . .") (injury sustained when workman squatted between two railroad cars to answer nature's call).

Other jurisdictions have declined to apply reasoning similar to *Christensen*. In *Karlslyst v. Industrial Commission*, 243 Wis. 612, 11 N.W.2d 179 (1943), the Wisconsin court granted compensation where a truck driver fell from a moving truck. Two drivers had been assigned to drive a semi to the next town to pick up equipment. While his co-employee drove, the claimant stepped onto the running-board of the vehicle intending to urinate. He lost his footing and fell while the truck was moving at between twenty-five and thirty miles per hour. The court, nevertheless, held his subsequent injuries to be injuries arising in the course of employment and said:

> There can be no doubt that under the decisions claimant, who was one of the two drivers of the truck, was at the time he sustained his injuries performing services growing out of and incidental to his

employment and while he was engaged in the performance of an act which was probably negligent, certainly silly and unnecessary, he was still in the course of his employment when he was accidentally injured.

11 N.W.2d at 180.

California rejected a rationale substantially similar to the *Christensen* rationale in *Associated Indemnity Corp. v. Industrial Accident Commission*, 18 Cal.2d 40, 112 P.2d 615 (1941). In *Associated* a dock superintendent frequently traveled along and across railroad tracks en route from dock to a freight depot. In making a routine trip from depot back to his office, the superintendent asked permission to catch a ride on an engine about to take off. The superintendent, as well as other employees, frequently rode on the engines. On this occasion the engine stopped about halfway to "blow steam." The superintendent stepped off to avoid the steam and fractured his leg. The court held the injury arose out of the employment and said:

Petitioner contends, however, that (claimant) in riding on the switch engine adopted such an unreasonable and hazardous method of traveling from the depot to the dock that it constituted an abandonment of his employment . . The doctrine urged by petitioner must be applied with extreme caution for the reason that it is barely distinguishable from the rules of contributory negligence and assumption of risk which are not applicable in compensation cases.

Indeed, it may well be asserted that the doctrine of 'added risk', that is, where an employee assumes a risk greater than that usually incident to his employment, he cannot recover, cannot be followed in California because it is in effect nothing more than contributory negligence.

112 P.2d at 619. *See also Williams v. Workmen's Compensation Appeals Board*, 41 Cal. App.3d 937, 116 Cal.Rptr. 607 (1974) (deliveryman's injuries compensable where he ran red light and crashed in an attempt to flee pursuing police).

The contrary position is exemplified by *General Steel Castings Corp. v. Industrial Commission*, 388 Ill. 66, 57 N.E.2d 454 (1944). In *General Steel* a plant workman customarily parked his car in a place which required him to cross railroad tracks en route to plant gate. There was an established route of ingress and egress which turned over a grade crossing maintained by the railroad company. Although the workman ordinarily followed the established route, he chose on July 3, 1943, to cross at a spot *lacking* a grade crossing in order to save steps. The workman was struck by a train and killed. Holding the death did not arise out of or in the course of employment, the Illinois court said:

An employee may not unnecessarily increase the risk of injury to himself or choose an unnecessarily dangerous place for the doing of an act which is claimed to be incidental to his employment. Where the employee assumes to undertake a dangerous act which is strictly outside of the scope of his employment, the risk undertaken is not incident to the employment.

57 N.E.2d at 457.

A similar position was taken in *Hurley's Case*, 240 Mass. 357, 134 N.E. 252 (1922), where a gas works laborer had reason to travel from the blower room to the forge. The usual course of travel was down the stairs and across the yard. The laborer, however, chose to travel on a one foot wide beam extending between the two blower rooms twenty feet above the ground. The laborer fell sustaining serious injuries. The Massachusetts court held the injuries did not arise out of the employment and said:

It [is] not within the scope of the claimant's work to walk on the beam. Every circumstance demonstrates that the beam was not a place where his employment called him either directly or incidentally. He voluntarily encountered an added risk not within the contemplation of his contract of service.

134 N.E. at 252.

The "added risk" or "added peril" doctrine is discussed in Larson IA *The Law of*

*Workmen's Compensation*, § 30.22, at 6–4 and 6–5. Larson points out the doctrine is frequently applied where the employee performs activities incidental to the main job in a needlessly dangerous manner. Larson states:

> The so-called "added risk" or "added peril" doctrine has been based almost entirely upon this type of case. In other words, *it is very doubtful whether, except in a few jurisdictions, there ever was a rule of general applicability to the effect that an employee forfeited his coverage by doing his job in a needlessly dangerous way.* The doctrine in practice was usually pressed into service only in the incidental-activity cases . . . . The "added peril" doctrine—in the sense of a doctrine that a needlessly dangerous method of doing the employee's active work takes him outside the range of compensation protection—is of no current importance.

(Emphasis added.)

Since the added risk doctrine, kin to the unusual and rash act doctrine, is a minority position and the Iowa case of *Christensen* has been distinguished rather than expanded since its announcement in 1922, the present appeal presents this court with the opportunity to put the doctrine to rest. Section 85.16 clearly does not contemplate such a bar to recovery of benefits. Judicial engrafting of the unusual and rash act doctrine to workers' compensation law distorts the statute by inserting a defense which, as the California court noted in *Associated Indemnity*, is barely distinguishable from the admittedly inapplicable rules of contributory negligence and assumption of risk.

As we stated in *Cady*, 278 N.W.2d 299:

> In keeping with the humanitarian objective of the workers' compensation statute, we apply it broadly and liberally. The legislation is primarily for the benefit of the worker and the worker's dependents. Its beneficent purpose is not to be defeated by reading something into it which is not there, or by a narrow and strained construction.

■ We hereby overrule the "unusual and rash act" doctrine of *Christensen v. Hauff Brothers*, and hold the doctrine cannot bar recovery of workers' compensation benefits.

■ We conclude, based on the undisputed facts, that Hawk's death arouse out of and in the course of his employment.

The district court is affirmed and the case is remanded to the commissioner for award of appropriate workers' compensation benefits as provided by law.

We have considered all contentions raised by appellants and find them without merit.

AFFIRMED.

All Justices concur except LeGRAND and REES, JJ., who dissent.

LeGRAND, Justice (dissenting).

I dissent from Division II and from the result solely because the majority ignores basic rules of statutory construction in arriving at its conclusion.

As the majority points out, the "unusual and rash act" doctrine is the minority view and, were we considering it for the first time, there are persuasive reasons for not adopting it. But we no longer have that option.

We have adhered to this rule since at least 1922. In almost sixty years the legislature has not elected to amend § 85.16 to correct our interpretation as applied in *Christensen v. Hauff Bros.*, 193 Iowa 1084, 188 N.W. 851 (1922).

Legislative inaction following an opinion placing judicial interpretation on a statute is some evidence that the legislature accepts our view as correct. When the legislative silence continues *in an area of legislative activity*, the presumption becomes stronger and stronger as time advances.

The Workers' Compensation field is one of considerable legislative activity. Hardly a legislative session passes without some amendment to the act. Yet this doctrine has remained untouched. This is in marked contrast to the dispatch with which legislative action greeted our opinion in *Craven v. Oggero*, 213 N.W.2d 678 (Iowa 1974). The

very next legislative session (65th GA, ch. 1111) amended § 85.22 to nullify what we said there.

We treated this same question in another field in *General Mortgage Corporation of Iowa v. Campbell*, 258 Iowa 143, 152, 138 N.W.2d 416, 420–21 (1965), where we said:

The legislature has had forty years and twenty regular sessions to change the frequently castigated sections of the Code [concerning the priority of mechanic liens], but has not seen fit to do so. The Uniform Commercial Code enacted by the 61st GA [General Assembly] makes no changes in the mechanic's lien law as it relates to real estate. It cannot be said the legislature is dissatisfied with the interpretation placed on these sections by this court.

"Where a particular interpretation has been placed on a statute by the court, and the legislature at its subsequent meetings was left the statute materially unchanged, it is presumed that the legislature has acquiesced in that interpretation." 82 C.J.S. Statutes § 316, p. 549. It has been held failure to amend a statute for twenty years raises a strong presumption of legislative satisfaction with the interpretation given it by the courts. *Ex parte Rogers*, 56 Idaho 521, 57 P.2d 342.

In the face of this inaction by the legislature in such an important and active field of law, we are reluctant to change an interpretation with which the construction industry, the financial institutions and their legal advisors have lived for nearly ninety years.

It seems rather late in the day to now say, as the majority does, that an interpretation announced in 1922 and accepted by the legislature since then has "engrafted" a doctrine which "distorts the statute."

REES, J., joins in this dissent.