James R. WRIGHT et al., Appellants,

v.

GUNTHER NASH MINING CONSTRUC-
TION COMPANY et al., Appellees.

Supreme Court of Tennessee.

May 4, 1981.

Jacky O. Bellar, Bellar & Hall, Carthage, for appellants.

James C. Summers, Howser, Thomas, Summers, Binkley & Archer, Nashville, for appellees.

## OPINION

FONES, Justice.

This is a workers' compensation case in which two related issues have been raised. The first is whether defendant's action leading to his death constituted "willful misconduct" or "willful failure or refusal to use a safety appliance" as those terms are contemplated in T.C.A. § 50–910. The second is whether decedent's death arose out of his employment in consideration of the unnecessary and dangerous method he chose to perform his job duties.

The trial judge held that decedent's conduct did rise to the level of "willful" and further held that his death did not arise out of his employment. The trial judge did not reach the issue involving dependency, which the parties have asked this Court to ad-

dress. For the reasons set out below, we reverse the decision of the trial judge and remand this case to the lower court for a determination of the dependency issue and appropriate disposition.

## I.

The relevant facts are not disputed. Decedent began working for defendant in 1975 in its mining operations. By December 1, 1977, the date of his death, he was twenty-two years old and had become a "lead miner." Thus, he was responsible for all employees working in the mine and his position of responsibility was immediately under that of the job foreman.

On the day of his death decedent and others were working in a mine shaft that was approximately four hundred and eighty-five feet deep and twelve feet wide. Miners descended and ascended into the shaft by means of a large bucket that was attached to a one and one half inch metal cable. This cable was greased with a repellent to prevent rusting and was attached to a motor. The top of the shaft was covered by two hydraulic doors, which remained open when the bucket was lowered into the shaft and closed when the bucket was raised out of the shaft.

The facts surrounding decedent's death were offered through the testimony of Mr. Gibbs, who was working at the top of the shaft and who was supervised by decedent. Gibbs testified that around five a. m. decedent had finished his drilling in the mine and had been raised out. The shift was not over until seven a. m., and the bucket was lowered back into the mine for the benefit of four or five men remaining below.

At this point the men working in the shaft "hung a piece of steel" while drilling. Gibbs testified that those at the top of the shaft knew this had happened because "it makes a funny racket when it hangs up." He stated that freeing the steel required "patience and work," that there was a "trick" to it, and that decedent decided to go back down into the shaft "to get it loose before it got messed up bad."

Rather than wait for the bucket to be raised out of the shaft, decedent told Gibbs to close the hydraulic doors to within eighteen inches of the cable. Gibbs argued a little with decedent about this, but when decedent commanded him to do so, he did as he was told. Decedent then donned a pair of gloves, walked over the doors to the cable, wrapped some rags around it, and proceeded to slide down into the shaft. Gibbs then went on with his work and did not check on decedent to see if he was all right. He stated that decedent had slid down the cable "a time or two" in the past without incident and recalled one particular time where decedent had used the cable to descend about eighty-five feet. As far as Gibbs knew, no one in the company knew of this practice.

Decedent was later found dead at the bottom of the shaft, the cause of his death being a fractured skull sustained by his apparent fall in the shaft.

Defendant offered no proof in this case. Thus, nothing in the record indicates that decedent was ever warned not to descend into the shaft in this manner. There is no evidence of any warnings of any kind posted near or around the mine shaft, nor is there any evidence of any rules or regulations of the employer governing mine safety.

## II.

The law is well settled that "[w]hile this Court is bound by the findings of the Chancellor on questions of fact, whenever there is any evidence to sustain the findings, we are not bound by the conclusions drawn by the Chancellor from undisputed facts, and may reach a different legal conclusion from that of the Chancellor on the same findings of fact." *Insurance Company of America v. Hogsett*, 486 S.W.2d 730, 733 (Tenn.1972). With this in mind, we turn to the legal issues raised in this case.

T.C.A. § 50–910 states as follows:
"Injuries not covered—No compensation shall be allowed for an injury or death due to the employee's *willful misconduct*

or intentional self-inflicted injury, or due to intoxication, or *willful failure or refusal to use a safety appliance* or perform a duty required by law. If the employer defends on the ground that the injury arose in any or all of the above stated ways, *the burden of proof shall be on the employer to establish such defense.*" (Emphasis added.)

The term "willful" as used in this section is not defined in the Code, but has been the subject of much discussion by the courts in this and other jurisdictions and by well-known treatise writers.

In defining the term "willful" this Court has limited its scope to the most extreme situations, and has for all practical purposes limited its application to willful disobedience to known and understood prohibitions.

In *Wheeler v. Glens Falls Insurance Company,* 513 S.W.2d 179, 183 (Tenn.1974), this Court noted that

"[t]here is a vast array of conduct by the claimant which has not been held to have defeated compensation. Among these are accident, negligence, inadvertence, thoughtlessness, error in judgment, or even recklessness. *Hoodenpyle v. Patterson,* 197 Tenn. 621, 277 S.W.2d 351 [1955]; *Coleman v. Coker,* 204 Tenn. 310, 321 S.W.2d 540 [1959]. In short, any conduct which does not rise to the level of wilfulness or deliberateness will not be considered [willful misconduct]."

In *Insurance Company of America v. Hogsett, supra,* at 733, the Court set forth a three pronged test for "wilful misconduct." The elements are: "(1) an intention to do an act, (2) *purposeful violation of orders,* and (3) an element of perversiveness." (Emphasis added.)

In *Coleman v. Coker,* 204 Tenn. 310, 316, 321 S.W.2d 540, 542 (1959), the Court, after review of several decisions dealing with the term "wilful," concluded that "[t]he term needs no further discussion because the word within itself signifies what is meant, that is, *regardless of what an employee is told he goes on 'hell bent for election' anyhow.*" (Emphasis added.)

We further note that in Larson's, *Workmen's Compensation Law,* at § 32.00 (1979) (hereinafter, Larson's) the author states the following about this defense.

"The statutory 'wilful misconduct' defense, whatever its actual general definition, *has in practical application been largely limited to the deliberate and intentional violation of known regulations* designed to preserve the employee from serious bodily harm." (Emphasis added.)

The author makes a similar comment about the defense of "wilful failure to use a safety device." Larson's, at § 33.00.

Our review of numerous decisions found in the annotations of T.C.A. § 50–910 confirm that Larson's general statements hold true in this State.

Therefore, in the absence of any evidence in the record that decedent willfully violated any order, notice, rule, regulation, or prohibition of any kind, we hold that defendant has not met its burden of proof, and its defense of "wilful misconduct" or "wilful failure or refusal to use a safety appliance" must fail. There can be no doubt that decedent was attempting to perform his job duties when injured. Certainly the manner in which he chose to do so was negligent, or grossly negligent, and probably reckless, but it does not follow that acts so characterized are beyond coverage in all circumstances. We note that there is nothing in the record indicating that there were any barriers or fences that would even imply a prohibition about the use of this cable as a means of descent. We further note that decedent had used this method of descent on prior occasions without incident, which demonstrated that as reckless and dangerous as that method of descent appeared, it had been accomplished by decedent without injury.

III.

The second issue, related to but not the same as the first, is whether decedent's method of performing his duties was an "added risk," or an unnecessary and rash act so that it cannot be said that his death arose out of his employment. We conclude

that even if his conduct is categorized as such, this is not sufficient to deny coverage in this case.

In Larson's at § 30.21 the author points out that the so-called "added risk" doctrine has usually been applied only in situations involving activities that are of marginal or incidental benefit to the employer. In § 30.22 he states as follows:

"The so-called 'added risk' or 'added peril' doctrine has been based almost entirely upon this type of case. In other words, it is very doubtful whether, except in a few jurisdictions, there ever was a rule of general applicability to the effect that an employee forfeited his coverage by doing his job in a needlessly dangerous way. The doctrine in practice was usually pressed into service only in the incidental-activity cases.... The 'added peril' doctrine—in the sense of a doctrine that a needlessly dangerous method of doing the employee's active work takes him outside the range of compensation protection—is of no current importance."

In the recent decision of *Hawk v. Jim Hawk Chevrolet-Buick, Inc.*, 282 N.W.2d 84 (Iowa 1979), the Supreme Court of Iowa was asked to determine the continued validity of the so-called "unusual and rash act doctrine" which is kin to the "added risk doctrine." After noting that this doctrine had been repeatedly distinguished, rejected, or abandoned in most jurisdictions, the Court concluded that it was no longer viable. The rationale of the Court, in the seven to two opinion, was that "[j]udicial engrafting of the unusual and rash act doctrine to workers' compensation law distorts the statute by inserting a defense which ... is barely distinguishable from the admittedly inapplicable rules of contributory negligence and assumption of risk." *Id.* at 91. Thus, compensation was allowed in the *Hawk* decision where the employee was killed while performing his job duties but was doing so in an "unusual" and "rash" manner.

We find the following language used in *Leonard v. Cranberry Furnace Co.*, 150 Tenn. 346, 354, 265 S.W. 543, 545 (1924), of further import:

"It may be said that the test is one of contract rather than conduct. If the employee is within the contemplation of his contract, if he is doing that which by his contract, either expressly or by implication, is made his duty, then he is in the course of his employment, *however negligent his conduct may be*." (Emphasis added.)

In the case of *Richardson v. J. Neils Lumber Company*, 136 Mont. 601, 341 P.2d 900 (1959), the facts were quite similar to those of the present case. In that case plaintiff was injured while riding a conveyor belt back to his work station. There were no signs posted prohibiting or warning the employees about this practice, and at least one other employee had ridden the conveyor belt without incident. The Court held that the injury sustained by the employee as a result of riding this conveyor belt did arise out of his employment. The Court's rationale was as follows:

"The fact that the mode of transportation utilized by the claimant was dangerous, as hindsight proves, did not as such remove him from the protection of the Workmen's Compensation Act. The test is whether the act could be reasonably contemplated. In *Leonbruno v. Champlain Silk Mills*, 229 N.Y. 470, 128 N.E. 711, 13 A.L.R. 522, Justice Cordoza said: 'Whatever men and boys will do, when gathered together in such surroundings, at all events if it is something reasonably to be expected, was one of the perils of his service.... The claimant was injured, not merely while he was in a factory, but because he was in a factory, in touch with associations and conditions inseparable from factory life. The risk of such associations and conditions were risks of the employment." 341 P.2d at 905 (1959).

■ Our conclusion from these authorities is as follows: that when an employee is performing the duties assigned to him by his employment contract and is acting in furtherance of his employer's interests, regardless of the fact that he performs those

**800**

duties in an unnecessarily dangerous or rash manner, it cannot be said that his resulting injuries did not arise out of his employment, provided that his conduct could be reasonably contemplated. If the activity performed by the employee is of only incidental benefit to the employer or is expressly forbidden, the result may be different, but we need not address that issue here.

■ In the present case decedent's method of descending into the mine shaft was certainly unnecessary, rash, and probably reckless. There can be no doubt, however, that he was involved with the duties created by his job when he was killed. He was on his employer's property during regular working hours attempting to reach fellow employees whom he reasonably thought needed assistance. His working environment exposed him to the dangers of the mine shaft and his duties to the necessity to descend therein. Although the method he chose to transport himself was dangerous, it cannot be said to have been beyond contemplation, and nothing in the record indicates that it was prohibited. Under these facts we hold that decedent's death arose out of his employment.

The case of *Lennon Company, Inc. v. Ridge*, 219 Tenn. 623, 412 S.W.2d 638 (1967), relied on by defendant is distinguishable from the present case in that it involved application of the so-called "rescue doctrine" to a situation where an injured employee was in no way acting in furtherance of his employer's business activities. Other cases cited therein are similarly distinguishable.

For the reasons set forth herein the decision of the trial court is reversed and the case is remanded for a determination of dependence and appropriate disposition. Costs of this appeal will be assessed against defendant.

HARBISON, C. J., and COOPER, BROCK and DROWOTA, JJ., concur.